**In the Matter of the Honorable Ronald E. DRURY, Judge, Boone Circuit Court.**

Nos. 06S00–9005–JD–358, 06S00–9201–JD–001.

Supreme Court of Indiana.

Oct. 29, 1992.

William E. Marsh, Indianapolis, for appellant.

Meg W. Babcock, Charles M. Kidd, Indiana Com'n on Judicial Qualifications, Indianapolis, for appellee.

## JUDICIAL DISCIPLINARY ACTION

### PER CURIAM.

Today we must decide whether Ronald E. Drury, judge of the Boone Circuit Court, has committed misconduct and if so, what sanction is appropriate. He stands accused of numerous violations of the Indiana Code of Judicial Conduct arising from his financial dealings and from his conduct in these proceedings.

After lengthy investigation, the Indiana Commission on Judicial Qualifications ("Commission") initiated formal charges against Drury in 1990 pursuant to Ind. Admission and Discipline Rule 25(VIII)(G). The charges are drafted in the necessarily technical language of the law. The essence of the charges and the essence of our conclusions, however, may be described more simply.

The evidence shows a judge who borrowed $2000 from a lawyer who practices in his court, did not disclose to anyone that money had changed hands, and continued to preside in cases involving his creditor. The judge also borrowed thousands of dollars from a girlfriend, and from her mother, none of which he disclosed and some of which he actively worked to conceal by filing false documents. When some of these parties reported the facts of these transactions, the judge concocted and participated in a plan to retaliate by harming their business.

He asked his principal female employee to lend him money. She complied by providing thousands of dollars as well, none of which the judge ever disclosed. The judge responds variously by saying most of what he did was not intentional or not a violation or not harmful. We cannot agree and have concluded that removal from office is the proper sanction for this misconduct.

The Supreme Court has jurisdiction over this proceeding by virtue of its responsibility for all disciplinary matters involving lawyers and judges. Article 7, Sec. 4, Constitution of Indiana. As is its practice, the Court assigned the task of hearing the evidence regarding the alleged misconduct to "Masters," who in this case were three of our most distinguished trial judges from various parts of the State. Admis.Disc.R. 25(VIII)(I).

The Masters found Drury ("Respondent") committed some but not all of the alleged misconduct. The Commission objected, contending it adequately proved all of the allegations of misconduct. Pursuant to Admis.Disc.R. 25(VIII)(O), it recommended Respondent's removal from the bench and discipline as an attorney. Re-

spondent also objected to the Masters' report. He argued the evidence merely showed he had committed innocent mistakes, not willful misconduct.

Pursuant to Admis.Disc.R. 25(V)(B), the Court suspended Respondent with pay on July 29, 1992. That rule provides a judge shall be suspended with pay while the Commission's recommendation for removal is pending.

 The Masters' recommendations are not binding upon this Court, in light of this Court's ultimate authority with regard to judicial discipline. Admis.Disc.R. 25(VIII)(N)(1). The Court reviews the record *de novo* and makes its own determination as to whether the judge has committed misconduct.

 At the hearing before the Masters, the Commission had the burden of proving misconduct by clear and convincing evidence. Admis.Disc.R. 25(VIII)(L). However, the Admission and Discipline Rules are silent as to the standard we should employ in our review. We hold the same standard of clear and convincing evidence is applicable to our determination of whether misconduct has occurred.

## I. The Yosha Loan

 The Commission charged Respondent in 1990 with accepting and failing to report a $2,000 loan from Louis "Buddy" Yosha, an Indianapolis attorney practicing in his court. The Masters found, and Re-

spondent does not deny, that he contacted Yosha about obtaining the loan in early 1986. The loan was necessitated by financial difficulties arising from Respondent's divorce.

Respondent does not challenge the Masters' findings that he borrowed the $2,000 from Yosha; that he failed to report the loan in his Statement of Economic Interests filed in January 1987 and in his First Amended Statement of Economic Interests filed in December 1987; that he reported the loan only after charges were brought by the Commission in connection with the loan; that the loan was not repaid until just before the filing of charges in 1990; and that no demand for payment was made prior to that time.

The Masters concluded Respondent, by soliciting and accepting the loan, and by failing to report such loan, violated Ind. Judicial Conduct Canon 5(C)(4)[1]. That provision prohibits judges from accepting certain loans. It also requires that judges report certain loans.

The Masters further determined Respondent violated Ind. Judicial Conduct Canon 3(C) by continuing to preside over cases involving Yosha or his firm without making any disclosure to the other lawyers or parties involved[2]. That Canon requires that a judge remove himself from cases in which his impartiality might reasonably be questioned. The Masters also found Respondent violated Jud.Canon 5(C)(1), which requires that a judge refrain from financial

---

1. Jud. Canon 5 provides in relevant part:
 A JUDGE SHOULD REGULATE HIS EXTRA-JUDICIAL ACTIVITIES TO MINIMIZE THE RISK OF CONFLICT WITH HIS JUDICIAL DUTIES.
 C. FINANCIAL ACTIVITIES.
 (1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.
 (4) Neither a judge nor a member of his family residing in his household should accept a gift, bequest, favor, or loan from anyone except as follows:
 (c) a judge or a member of his family residing in his household may accept any other gift, bequest, favor, or loan only if the donor is not a

party or other person whose interests have come or are likely to come before him, and, if its value exceeds $100, the judge reports it in the same manner as he reports compensation in Canon 6C.

2. Jud. Canon 3 provides in relevant part:
 A JUDGE SHOULD PERFORM THE DUTIES OF HIS OFFICE IMPARTIALLY AND DILIGENTLY.
 The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:
 C. DISQUALIFICATION.
 (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned....

dealings which reflect adversely on his impartiality.

At the conclusion of their report, the Masters also found Respondent violated Ind. Judicial Conduct Canons 1 [3] and 2 [4]. Jud. Canon 1 requires a judge observe high standards of conduct to uphold the integrity and independence of the judiciary. Jud. Canon 2 requires that a judge conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

The Masters rejected the Commission's contention that Respondent violated Jud. Canon 5(C)(4)(a), which limits gifts to judges. The Masters determined the $2,000 was a loan, not a gift.

In reviewing these charges, we are struck by the unchallenged fact that during the four-year period in which Respondent owed money to Yosha, he continued to preside over cases in which attorneys from Yosha's law firm represented the litigants. Respondent could not recall ever having disclosed the Yosha debt to any of the parties or their counsel appearing before him.

Respondent admits he knew by early 1988 that loans from lawyers to judges were improper. Record, p. 202–203, 240, 260. Yet Respondent did not report the Yosha loan or pay it back for another two years. In fact, he reported the loan only after these charges were brought. Record, p. 240.

He claims he simply forgot about the loan when he filed his Statement of Economic Interests in 1986 and his First Amended Statement of Economic Interests in 1987. Record, pp. 207, 260. Yet he admits that within a year of the 1986 loan he acknowledged to Yosha he had not repaid it. Apparently, only the Commission's charges were sufficient to revive his memory of the loan for reporting purposes. After the initiation of those charges, he filed a Second Amended Statement of Economic Interests reporting the loan made four years earlier.

Respondent attempts to diminish the seriousness of these violations by asserting Yosha did not attach any "strings" to the loan or ask for any particular special treatment. Respondent cites the lack of any evidence connecting the loan to any cases in his court. He concludes a "negative perception" is the only harm which occurred. Respondent's Brief, p. 3.

Respondent's argument ignores Indiana's requirement of an appearance of impartiality by all entities empowered with adjudicative authority. See, *City of Mishawaka v. Stewart* (1974), 261 Ind. 670, 310 N.E.2d 65. This requirement is especially applicable to this state's judges, as our Code of Judicial Conduct repeatedly makes clear.

Respondent contends that at the time, he did not consider the loan improper. He states he now recognizes he should have been more diligent in ascertaining the propriety of the loan. Respondent contends the Commission produced no evidence that his acts and omissions in connection with the loan constituted willful misconduct. The Masters found otherwise, and we agree with their findings.

Even a cursory glance at the Code of Judicial Conduct at any time during the four years the loan was outstanding would have alerted Respondent that his solicitation and acceptance of the Yosha loan, as

---

3. Jud. Canon 1 provides in relevant part:
A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective without any limitation upon the Supreme Court in the exercise of its power of general superintendence, whether statutory or inherent, in areas not delineated in the Code.

4. Jud. Canon 2 provides in relevant part:
A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES.
A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

well as his failure to report it, violated the Code. Respondent admits in his brief on this issue that he "considered, at least superficially, whether it was proper for him to borrow the money from Mr. Yosha, a lawyer." Respondent's Brief, p. 2. He contends that he asked some judge and lawyer friends about the loan. Record, p. 201.

We agree with the Masters' finding of clear and convincing evidence that Respondent, by soliciting, accepting and failing to report the $2,000 loan, violated Jud. Canons 1, 2, 3(C), 5(C)(1), and 5(C)(4)(c). We find Respondent should not have sought or accepted the loan.

Once he did accept it, he should have disqualified himself from all cases in which Yosha's law firm was involved. At the least, Respondent should have disclosed the loan to the other parties and attorneys involved in any lawsuit over which Respondent presided which involved Yosha's law firm. Respondent also was obligated to report the loan in 1986. Respondent's failure to report constituted willful misconduct.

### II. The Kennedy Campaign Contribution

Under this count the Commission contends the facts demonstrate that Respondent accepted a $1000 loan or gift from Yosha in connection with a political candidate's fundraiser. Accordingly, the Commission contends Respondent willfully violated Jud. Canons 5 and 6.

The Masters concluded that while the propriety of Respondent's actions may be questioned, the evidence failed to show clearly and convincingly that the Code had been violated. We agree with the Masters and adopt their findings in this regard.

### III. The William Large Loan

██ In 1990, Maria Albano, who was dating Respondent, agreed to loan Respondent $3,000. However, the transaction was structured such that Albano wrote a check to Respondent's friend, William Large. William's spouse, Emily, then wrote a check made payable to Respondent. This transaction occurred in the Larges' home, with all the participants present.

No one disputes the loan was in fact from Ms. Albano, as Respondent issued a promissory note to her at the time of the transaction. On January 30, 1991, Respondent filed a Statement of Economic Interests identifying William Large, rather than Maria Albano or Emily Large, as the source of the loan.

According to Respondent, he structured the loan in this manner because he was concerned that local bank employees would communicate information about the loan to Marcia Frank, his court reporter and girlfriend. Respondent wanted to keep the loan from Ms. Albano a secret from Ms. Frank. The Respondent admits the transaction was a "sophomoric scheme." Respondent's Brief, pp. 6–7.

The Masters concluded the false identification of the source of the loan was intentional. The Masters found the misrepresentation violated Jud. Canon 5, as well as Ind. Professional Conduct Rule 8.4(c). The latter, which binds all attorneys, provides, "It is professional misconduct for a lawyer to: ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Masters did not address the Commission's contention that Respondent's actions with regard to this transaction constituted willful misconduct.

We generally agree with the Masters' findings. We find clear and convincing evidence that Respondent, in misrepresenting the source of the loan on his Statement of Economic Interests, violated:

(1) Jud. Canon 5(C)(4)(c), which requires judges to report loans of more than $100 from individuals, and

(2) Prof.Cond.R. 8.4(C).

We further find such activities constituted willful misconduct.

### IV. Maria Albano/Bonnie Albano Loans

During 1990, Maria Albano loaned Respondent over $7,000 which was never reported on any Statement of Economic Interests. In addition, Maria's mother, Bon-

nie Albano, loaned money to the Respondent in 1990 which was never reported. The unreported loans from Bonnie were made through Maria.

Respondent claims he does not recall any of the unreported loans from Bonnie Albano; however, he does not deny such loans exist. Record, pp. 246–249. In total, over $15,000 in unreported loans were made to the Respondent from either Maria or Bonnie Albano during 1990.

Respondent contends the loans from Maria Albano did not require reporting because Maria and he were dating. He reasons that because of their personal relationship, he would have recused himself from any case involving Maria, and that Jud. Canon 5 of the Code should be read to apply to only those individuals likely to come before the court on which he serves. With regard to the unreported loans from Bonnie Albano, the Respondent contends he did not realize the money was coming from anyone but Maria.

Because of contrary evidence presented at the hearing, the Masters disbelieved Respondent's claim that he was unaware Bonnie Albano was the source of some of the loans. The Masters concluded that irrespective of Respondent's contentions, the loans should have been reported. Respondent's failure to do so violated Jud. Canon 5(C)(4)(c), according to the Masters. However, the Masters found such conduct was not proven to be dishonesty, deceit, or misrepresentation prohibited by Prof.Cond.R. 8.4.

We agree in part. Respondent's claim that he does not recall Bonnie's participation in providing $7,900 in unreported loans appears disingenuous. The Albanos testified Respondent sought money directly from Bonnie, who agreed to loan him $10,-000 in installments. They further testified Respondent thereafter specifically inquired about Bonnie giving him the installments. According to Maria Albano, Respondent was told when he received the money that it was from Bonnie. The Masters found such testimony credible and so do we.

■ We also reject Respondent's claim that he did not have a duty to report these loans. Jud. Canon 5(C)(4) generally prohibits judges from accepting loans from lenders who are not relatives or lending institutions. Jud. Canon 5(C)(4)(c) creates an exception where the lender is not a party or other person whose interests have come or are likely to come before him; however, such loans, if they exceed $100, must be reported. In other words, any loan from a non-relative or financial institution which exceeds $100 must be reported under Jud. Canon 5(C)(4)(c). Therefore, the Masters were correct in determining Respondent had a duty to report the loans, regardless of whether they came from Bonnie or from Maria.

■ We believe Respondent was aware of this duty and simply disregarded it. Five months before he filed his Statement of Economic Interests omitting the Albano loans, Respondent acknowledged in his answer to the Yosha charges:

{Respondent} does admit that Canon 5(C)(4)(c) requires that ethically loans should be reported on the annual economic interests statements.

Moreover, if Respondent had truly believed he had no duty to report any loans from Maria, he would have had no motivation for involving William and Emily Large in camouflaging the source of the $3,000 loan from Maria discussed in Section III. He simply would have taken the loan in cash directly from Maria, as he did on other occasions, and thereby kept the loan secret from Ms. Frank.

Respondent's knowledge of his reporting responsibilities and his intent to circumvent them is also indicated in Maria Albano's testimony. She testified Respondent told her in 1991 that he had not reported the 1990 loans from Bonnie or her; however, he stated he was obligated to report a subsequent loan from Bonnie for $15,000 because Bonnie had written him a check. Record, pp. 123–124.

We find the Commission proved by clear and convincing evidence Respondent knew the source of the Albano loans and violated his duty to report them. Such failure constitutes a violation of Jud. Canon 5(C)(4)(c).

We disagree with the Masters' failure to find Respondent's non-reporting of these loans violated Prof.Cond.R. 8.4. We find clear and convincing evidence that such conduct constituted dishonesty, deceit and misrepresentation prohibited by that rule.

We conclude Respondent's failure to report the Albano loans constituted willful misconduct.

### V. The Marcia Frank Loan

In early 1991, Respondent requested a loan of $20,000 from his court reporter, Marcia Frank. She loaned him $8,000 in March, 1991. The Masters concluded that while borrowing money from employees creates a potential for exploitation, and should be discouraged, the existence of the loan in and of itself does not constitute clear and convincing evidence of a Code violation.

We disagree. We accept the Commission's contention that Respondent's solicitation and acceptance of a large loan from a court employee constitutes willful misconduct.

An employer's solicitation of a large loan from an employee whom he closely supervises and whom he may discharge is questionable in any employment setting. Such behavior is particularly troubling in a judicial setting, given the higher ethical standards applicable to judges.

The potential for abuse is obvious. We find clear and convincing evidence establishing Respondent exploited his judicial position by soliciting the $8,000 loan from Ms. Frank. Such conduct violated Jud. Canon 5(C)(1).

### VI. The Albano Letter

Bonnie Albano owns and operates the Pixie Playhouse Day Care Center in Lebanon, Indiana. Maria Albano is a preschool teacher at the facility. On January 3, 1992, the Indiana Division of Family and Children, which has jurisdiction over the licensing of day care centers, received a letter purporting to be from "Concerned parents of Lebanon, IN."

The letter states:

Many parents of children attending Pixie Playhouse in Lebanon, Indiana are very upset with rumors that one of the teachers of their children is a convicted felon. Some of us got together and did some research and found out that the rumor is in fact very true.

We are concerned about Maria Albano who is a teacher of the preschool education component of the Pixie Playhouse program on South Meridian Street in Lebanon.

As you can see from the enclosed information, a certified copy of court documents from Marion County, Indiana, prove (sic) that Maria Albano was convicted on December 21, 1990, of Criminal Mischief—Class D Felony. Attached to the conviction are the Charging Information and the Probable Cause Affidavit. We talked to a lawyer who did some research and asked some questions. He told us that the Felony conviction appears to violate state law and rules established by your office as to the requirements for teachers at day care centers of small children. He said to mention specifically Indiana Code 12-3-2-1 et seq and 470 Indiana Administrative Code 3-4.3-7(b)(2).

He also said there is a requirement that day care center teachers have "Reputable standing in the community." Obviously, we do not feel a convicted felon is "reputable" and we feel she should not be teaching our children.

We are very upset and hope that you can do something about the situation. We fear reprisals against our children, since the Pixie Playhouse is a family-run operation, and therefore wish to remain anonymous. We hope you understand our position....

Commission Exhibit 6.

Included with the letter were copies of certified documents from Marion County Municipal Court 5 relating to Ms. Albano's arrest for criminal mischief. Although she originally was charged with a felony, Ms. Albano was convicted of a misdemeanor and placed on probation. The order of judgment reflecting the misdemeanor con-

viction was omitted from the documents accompanying the letter.

The letter to the Indiana Division of Family and Children, and its accompanying court records did *not* come from "Concerned Parents of Lebanon, IN." These highly inflammatory documents were the handiwork of Respondent and his son, Matthew Drury.

Respondent admitted procuring copies of certified documents relating to Ms. Albano's conviction. The documents included the order of judgment indicating Ms. Albano was convicted of a misdemeanor. He testified he believed the papers stated she was convicted of a felony. He explained this mistake in part by saying he had not presided in criminal cases for several years. Record, p. 228. Respondent also testified Ms. Albano told him she had been convicted of a felony. Record, p. 227.

Respondent claimed Matt, his teenage son, drafted the letter before conferring with Respondent about it. Record, p. 232. Respondent asserted he immediately confronted Matt about the letter after discovering it in Matt's underwear drawer sometime around Christmas 1991. Record, p. 231.

Respondent testified he told Matt to destroy the letter and assumed Matt followed those instructions. Record, p. 232. Respondent claimed he did not discuss the letter with his son again until he read newspaper accounts relating the agency's receipt of the letter. Record, p. 233.

Respondent admitted calling the State Welfare Department and obtaining specific Administrative Code citations with regard to preschool teaching requirements. He testified he informed Matt about such research in response to Matt's inquiry; however, Respondent asserts he did not direct Matt to the provisions cited in the letter. Record, p. 253. Telephone records show numerous telephone calls from the Boone County courthouse to the Departments of Education and the Division of Children and Family Services on December 26, 27, and 30. Commission Exhibit 9. The letter is dated December 31, 1991.

Matt testified he talked with Respondent about writing a letter regarding Ms. Albano's arrest. Matt testified:

> I asked my father how I'd go about writing a letter like this? (sic) He told me there were certain guidelines and regulations set forth in the Indiana Code. And that if one would look them up you'd find what stipulations there are to be a teacher. What guidelines you have to follow. I didn't know how to do it. I asked him if he would do it and show me. At first he was reluctant, but he did it....
>
> At first he was reluctant and he told me he wouldn't do it. And I don't know why he did it but he went to the bookcase in our family room. Pulled out several different books, they were different colors, and opened open (sic) them up to the sections. I don't remember exactly what I done, if I'd gone back to my bedroom at that point, but he looked them up. We sat down and discussed it. Then the phone rang and he went down in the next room to take the call. I jotted down the information and kept it.

Record, pp. 151–52.

Matt also testified Respondent told him how to locate the particular government agency which monitors preschool teachers. Record, pp. 157–158. Matt testified he obtained a partial address from his father's papers and obtained the remainder of the address through telephone calls to governmental agencies. Record, pp. 159, 165.

In his earlier deposition, however, Matt testified he found the address for the agency among his father's papers and therefore had no need to make any phone calls to ascertain the address. Record, p. 166. Matt explained this discrepancy by noting he was upset during the deposition. Record, pp. 166–167.

The Masters found the letter was conceived by Respondent but sent by Respondent's son. The Masters found Respondent was angry because his relationship with Maria Albano had terminated in late 1991. He also was angry because the Albanos were responsible for providing information

leading to the charges involving their loans to him, according to the Masters.

The Masters found Respondent did not direct his son to send the letter. The Masters therefore concluded that no violation of the Code had been proved by clear and convincing evidence.

We disagree with the Masters' findings for several reasons. First, we view Respondent's alleged interpretation of Ms. Albano's conviction as inherently incredible. Admittedly, the order of judgment indicates Ms. Albano pleaded guilty to a felony charge. However, the order proceeds to state the trial court "enters a judgement (sic) of conviction for the offense(s) of: Count (I) *Criminal Mischief Class A (Misdemeanor)*". The word "Felony", which appears next to the word "Misdemeanor", is stricken.

We believe even a non-attorney, after reading that document, would not conclude Ms. Albano was convicted of a felony. To attribute such a conclusion to Respondent is not logical, given the extent of Respondent's judicial experience.

We also believe the conflicts between the testimony of Respondent and his son substantially erode their credibility. Respondent claimed during the hearing before the Masters that he never discussed the letter with his son before discovering it. The son says he drafted the letter after Respondent told him how it could be done. Respondent admitted during his deposition that he probably was responsible for the "genesis" of the letter. Commission Exhibit 10, p. 78.

Matt Drury claims at one point he obtained the agency's address through his father's papers and through telephone calls. That conflicts with the Matt's earlier testimony that he obtained the complete address from his father's papers and therefore did not have to make any telephone calls.

These inconsistencies are not the only reasons prompting this Court to discount Respondent's story. A Commission witness testified Respondent told her he could get Maria Albano in trouble by reporting her alleged felony conviction. Respondent indicated Ms. Albano would not be allowed to teach at a daycare center, according to the witness. Respondent allegedly claimed no one would know if he took such action against Ms. Albano.

Respondent admitted he indicated to the witness that he had information damaging to Ms. Albano. However, he testified he told the witness he would never use it against Albano because he was "not that kind of person." Record, p. 230.

We believe clear and convincing evidence establishes Respondent substantially assisted in the preparation and mailing of the letter. The letter was his means of intimidating and retaliating against Bonnie and Maria Albano for cooperating in the Commission's investigation. By doing so, Respondent engaged in willful misconduct in office, conduct prejudicial to the administration of justice, and conduct bringing the judiciary into disrepute. Such misconduct violated Jud. Canons 1 and 2 and Prof. Cond.R. 8.4.

Even if we accept the Masters' finding that Respondent was responsible for the creation of the letter but not its mailing, the evidence mandates a finding of misconduct. The Masters appear to find evidence of a conspiracy by Respondent and his son to draft the letter. The record makes clear that absent Respondent's substantial participation, the letter would not have been mailed. Therefore, Respondent cannot disclaim responsibility for the letter simply by alleging his son failed to destroy a letter which should never have been created and which Respondent could have destroyed himself.

## VII. The Sanction

Indiana judges may be disciplined or forced to retire if they engage in any of the following:

(1) willful misconduct in office;

(2) willful misconduct unrelated to the judicial office that brings such office into disrepute;

(3) conduct prejudicial to the administration of justice, including the repeated failure to adhere to the rules of procedure; or

(4) violation of the Code of Judicial Conduct, the Rules of Professional Conduct, or other professional rules duly adopted by the Indiana Supreme Court.

Admis.Disc.R. 25(III)(A)(3), (4), (6), (7).

We have found clear and convincing evidence that Respondent has engaged in willful misconduct in office, in willful misconduct unrelated to the judicial office that brings the office into disrepute, and other violations of the Code of Judicial Conduct and Rules of Professional Conduct. Admis.Disc.R. 25(III)(A)(3), (4), and (7).

■ Upon a finding of judicial misconduct, the Court may impose any of the following professional disciplinary actions: removal, retirement, suspension, discipline as an attorney, limitations or conditions on the performance of judicial duties, reprimand or censure, fine, assessment of costs and expenses, or any combination of the above sanctions. Admis.Disc.R. 25(IV)(A). Removal on the basis of the Commission's recommendation is appropriate where the judge engages in "willful misconduct in office, willful or persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Ind.Code 33-2.1-6-4 (West 1983).

■ In support of its recommendation for Respondent's removal and discipline as an attorney, the Commission asks this Court to consider:

(1) Respondent committed multiple violations.

(2) Respondent committed repeated violations.

(3) Respondent's violations involved falsification of documents filed in his judicial capacity.

(4) Respondent persisted in his misconduct after public proceedings were initiated.

(5) Respondent displayed a lack of candor during the the course of these proceedings.

(6) Respondent's responsibility for the letter exhibits a lack of remorse and a retaliatory and deceitful posture against Commission witnesses, indicating he is unwilling to meet the high standards of conduct by which he is bound.

The Commission also requests an order preventing Respondent from seeking any Indiana judicial office for a period of time deemed appropriate by the Court. The Commission further seeks to recover the costs of this proceeding.

Respondent responds by claiming the recommended sanction is disproportionate to the violations. He blames poor judgment and claims innocent mistakes, but he denies any willful misconduct. He asserts the Code of Judicial Conduct is confusing and open to conflicting interpretations.

As further mitigating circumstances, he claims the only harm resulting from his actions was with respect to "perception." He also suggests this Court should be sensitive to constitutional issues created by Respondent's re-election after these charges were initiated.

In imposing the sanction of removal, we are mindful that the voters of Boone County most recently elected Respondent as Circuit Court judge in 1990 after 14 years on the bench. However, even Respondent recognizes this Court's constitutional power to discipline judges.

Moreover, at the time Respondent was re-elected, the fact finding process was in its seminal stages. A judge has obligations beyond satisfying the voters of his county, as the Code of Judicial Conduct makes clear. When a person assumes judicial office in this state, he or she accepts the responsibility of becoming familiar with and complying with the Code of Judicial Conduct and of upholding the integrity of the judiciary.

The Masters were unable to arrive at a consensus concerning a recommendation for a sanction, except that they agreed the Court should impose no less a sanction than a public reprimand. We believe Respondent's conduct renders him unfit for judicial office, although we reach that conclusion only after long and thoughtful deliberation.

Our determination of the appropriate sanction has been complicated by the fortunate circumstance of few precedents of comparable magnitude. Further, this is the first case employing the formal hearing process adopted in our current rules governing judicial discipline. Typically, the respondent judge and the Commission agree to an appropriate sanction, negating the necessity for a formal hearing.

We have imposed lesser sanctions than removal in some judicial discipline cases. We note a common characteristic of those cases is the lack of repeated instances of deceitful and improper conduct. *See, e.g., Matter of Katic* (1992), Ind., 595 N.E.2d 259; *Matter of Sallee* (1991), Ind., 579 N.E.2d 75; *Matter of Bean* (1988) Ind., 529 N.E.2d 836; *Matter of Alsip* (1986), Ind., 499 N.E.2d 1102.

That mitigating circumstance is not present here. We are faced in this proceeding with multiple counts of deceptive conduct involving Respondent. Moreover, this is not the first time that this Court has had occasion to question Respondent's conduct.

Three years ago, the Court admonished Respondent for his role in another judicial discipline action. *See, Matter of Sauce* (1990), 561 N.E.2d 751. In that case, Respondent improperly transferred custody of a child to the father without notice to mother; the father was a judge in a neighboring county and was found to have acted improperly in his dispute over child custody.

Our restraint in dealing with the present charges, however, is evident in our refusal to impose any restrictions on Respondent's privilege to practice law in this state. We have imposed such restrictions in other instances of judicial misconduct. *See, e.g., Matter of Hammond* (1990), Ind., 559 N.E.2d 310; *Matter of Lewis* (1989), Ind., 535 N.E.2d 127; *Matter of Wireman* (1977), 270 Ind. 344, 367 N.E.2d 1368; *In re Littel* (1973), 260 Ind. 187, 294 N.E.2d 126.

Respondent's solicitation, acceptance, and non-disclosure of the $2,000 loan from an attorney practicing in his court justifies a severe sanction in and of itself. Respondent's request for the loan was inappropriate because the cloak of judicial power is not removed when the judge leaves the courtroom. Even where the judge's request for a loan from an attorney is innocent, undue pressures to comply and unrealistic expectations of favorable treatment may be generated. Moreover, judge-attorney loans cannot help but create a perception of "justice for sale."

Respondent's explanation for his failure to disclose the loan is implausible. He asserts he forgot about the $2,000 loan for purposes of reporting, but he remembered it on other occasions during the four years. He acknowledges he read an advisory opinion indicating loans from lawyers to judges were improper, but he did not remember the $2,000 loan at that time. After reviewing the evidence regarding the Yosha loan, we are unconvinced it would have been reported or repaid absent recent scrutiny into Respondent's finances.

We also find a basis for removal in the charges regarding witness intimidation. Respondent's deliberate misrepresentation of Ms. Albano's criminal record, his orchestration of a scheme to publicize such lies, and his use of his teenage son in this plot is appalling. Respondent's malevolent intent was clear—to dissuade the Albanos from or punish them for participating in these proceedings.

Witness intimidation is a reprehensible offense; it threatens the search for justice by attempting to silence those who would otherwise speak. This type of dishonesty strikes at the heart of what the judiciary should be—impartial arbiters of the truth who avoid even the shadow of impropriety.

We also are disturbed by Respondent's propensity for filing inadequate or false financial reports. He has several excuses: He forgot ... He did not recognize his duty to report ... He did not know the source of the loan. However, none of these excuses rings true. Only when faced with uncontroverted evidence of falsification with regard to the William Large loan did Respondent acknowledge irregularity with regard to his financial reports. Even then, he denied willful misconduct.

The requirement that judges report their financial transactions is designed to protect the litigants and lawyers who appear before such judges. Statements of Economic Interests alert parties to the potential prejudices of judges, thereby creating a checks and balances system which promotes an objective judiciary and enhances the perception of fairness in the courts. Failure to correctly report financial transactions as required is more than a bureaucratic misstep: it is a breach of the system by which we, as judges, maintain our honesty.

Respondent's actions show disrespect for the exceptional responsibilities of the judicial office. Through his indifference to the rules which bind judges and his unfortunate meshing of personal and judicial life, Respondent has demonstrated a temperament inappropriate for judicial office. Considering also his pattern of questionable and sometimes deceitful financial transactions, we reach the inescapable conclusion that Respondent's actions justify—and in fact, mandate—his removal from the bench. However, we do not find Respondent's actions so egregious as to merit the further sanction of disbarment. In rejecting this additional sanction available to us, we take into consideration Respondent's long service and high productivity as a judge.

For all of these reasons, we reject the Commission's recommendation that we impose additional disciplinary measures upon Respondent as an attorney.

THEREFORE, IT IS ORDERED that effective immediately Judge Ronald E. Drury be and he hereby is removed from the office of Circuit Judge for Boone County, Indiana, that being the 20th Judicial Circuit. Having been so removed, Respondent is ineligible for judicial office in accordance with Art. 7, Sec. 11 of the Indiana Constitution and I.C. 33–2.1–6–4. Costs to the Respondent.