**In the Matter of William C. McCLAIN, Judge of the Vigo County Court.**

No. 84S00–9311–JD–1224.

Supreme Court of Indiana.

March 21, 1996.

Ronald E. Elberger, Scott A. Weathers, Bose, McKinney & Evans, Indianapolis, for the respondent.

Meg W. Babcock, Charles M. Kidd, Indiana Comm'n on Judicial Qualifications, Indianapolis, for the Commission.

## JUDICIAL DISCIPLINARY ACTION

## PER CURIAM.

### Background

At issue in this case is whether William C. McClain, the elected judge of the Vigo County Court, has engaged in conduct for which he may be disciplined as a judge and if so, what sanction is appropriate.

The Indiana Supreme Court has jurisdiction over this proceeding by virtue of its responsibility for the discipline of attorneys and judges. Ind. Const. art. 7, § 4. Our state Constitution also creates a judicial qualifications commission ("Commission"). Ind. Const. art. 7, § 9. The Commission is responsible for the receipt and investigation of all complaints of misconduct lodged against the judges and justices of this state. Ind. Const. art. 7, § 11; Ind.Admission and Discipline Rule 25(I)(B). The Court has also cre-

ated rules and procedures to govern the judicial disciplinary process. Admis.Disc.R. 25.

In this case, the Commission's investigation of alleged judicial misconduct led to the filing of formal charges against McClain ("Respondent"). Admis.Disc.R. 25(VIII)(G). The Commission's statement of charges alleged that Respondent engaged in a pattern of harassment and abuse of office directed toward a female court employee and her family and boyfriend. Respondent was charged with willful misconduct in office,[1] willful misconduct unrelated to the judicial office that brings such office into disrepute,[2] and with violations of Canons 1 and 2 of the Code of Judicial Conduct.[3]

Upon recommendation by the Commission, Respondent was suspended from the performance of his judicial duties with pay, pending the disposition of the charges. Admis.Disc.R. 25(V)(E). Respondent denied any misconduct. By rule, the Court then appointed a panel of Masters to take evidence in a hearing and to report thereon to the Court. Admis.Disc.R. 25(VIII)(I). In this case, three distinguished trial judges were appointed as Masters. The Court wishes to express its gratitude for the diligent and thoughtful work of the Masters in this case.

A hearing was held over several days and evidence was taken. The Respondent was represented by counsel throughout the proceedings. After the hearing and following their deliberations, the Masters filed a report to the Court as anticipated by the applicable rules. Adm.Disc.R. 25(VIII)(N). The report contained forty-eight findings of fact ("Findings"), nine findings on matters of credibility ("Credibility Findings"), and four conclusions ("Conclusions"). The Court adopts all the Masters' findings but not all their conclusions.

---

1. Willful misconduct in office is a sanctionable offense. Adm.Disc.R. 25(III)(A)(3).

2. Adm.Disc.R. 25(III)(A)(4).

3. Those Canons state, in pertinent part:
   An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall preserve the integrity and independence

of the judiciary. The provisions of this Code are to be construed and applied to further this objective.
Ind.Judicial Canon 1(A).
   A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Jud.Canon 2(A).

The harassment of the female court employee and her family charged by the Commission took the form of anonymous phone calls and vulgar unsigned letters, one of which was accompanied by a used condom. The Commission charged that Respondent was responsible for and was involved in the harassment.

The Masters concluded the Commission failed to prove by clear and convincing evidence that Respondent engaged in judicial misconduct. As provided in our rules, the Commission took a different view and filed objections to the Masters' report with its own recommendation. Adm.Disc.R. 25(VIII)(O). The Commission asserts it proved its case, and recommends that Respondent be removed from the bench. The Respondent replied to these objections and to the recommendation of the Commission. Adm.Disc.R. 25(VIII)(P). At that point, this Court began its own review of the case.

■ We note at the outset that our standard of review of the Masters' report is *de novo*. *In re Drury*, 602 N.E.2d 1000, 1002 (Ind.1992). "The recommended findings of fact and conclusions of law are not binding upon the Supreme Court." Admis.Disc.R. 25(VIII)(N)(1); *see also* Admis.Disc.R. 25(VIII)(P)(3). At the hearing before the Masters, the Commission has the burden of proving misconduct by clear and convincing evidence. Admis.Disc.R. 25(VIII)(L)(1). We have held that in our *de novo* review, the same standard of proof applies. *Drury*, 602 N.E.2d at 1002.

After a thorough review of the record and findings, we conclude clear and convincing evidence demonstrates that Respondent had a participatory role in the sending of the letter which contained the condom and in the pattern of harassment directed toward a court employee and her family. These actions constitute willful misconduct and violate the ethical standards Respondent was obligated to uphold.

### Analysis

At all times relevant to these proceedings, Respondent was the judge of the Vigo County Court. Finding 2. In August 1990, an individual named Laura Hauser wrote to Respondent inquiring as to possible employment. Finding 3. After meeting with Hauser for lunch, Respondent made suggestions about how to revise her resume. Finding 4. Hauser then submitted her resume to Respondent. Finding 5. Ultimately, Hauser was hired as a secretary for the local community corrections program operated out of the courthouse offices. Findings 9, 10. Hauser worked in the office across the hall from Respondent. Finding 10.

At around the same time Hauser was hired, an individual named Tom McQueary was employed as the assistant director of the community corrections program. Finding 11. During the ensuing months, the director of the program, Respondent, McQueary, and Hauser would go to lunch together from time to time. Findings 11, 12.

Respondent often gave gifts to the courthouse staff. Finding 15. He included Hauser in this gift-giving. On different occasions he gave her a makeup compact, four T-shirts, a beach souvenir, a black garter, a bumper sticker, a coupon book, an inexpensive tennis bracelet, and flowers. Finding 16. On two separate occasions, Respondent also gave Hauser gifts of money. In both instances, the gifts were cash in the amount of one hundred dollars. Finding 21. One of these gifts took the form of a one hundred dollar tip given by Respondent to Hauser while she was working part-time at a second job as a waitress. Transcript, Vol. I, pp. 248–49. There was no evidence of similar large monetary gifts from Respondent to other court staff.

Respondent asked Hauser to have dinner with him in Indianapolis, an invitation which was declined by Hauser. Finding 26. Respondent also commented to Hauser that she would fit in well with his family. Finding 27. Hauser testified at the hearing that she began to feel intimidated by Respondent and the Masters make no finding to the contrary. Transcript, Vol. I, p. 253.

We find that Respondent, in giving Hauser two gifts of one hundred dollars each, asking her to have dinner at a location over fifty miles away, and in telling her she would fit in well with his family, clearly and convincingly

exhibited an interest in Hauser that went beyond mere employer-employee relationship.

Throughout the relevant time period, Hauser was living in Terre Haute and dating a man named Jeff Reeder, who is now her husband. Transcript, Vol. I, p. 267; Finding 24. On one occasion during this general time period in which the gift-giving and dinner invitation were going on, Hauser observed Respondent in his truck near her apartment. Finding 23. Specifically, the Masters found Respondent was observed "in his truck at 11th and Maple in Terre Haute, near her apartment." Finding 23. According to Hauser, she and Reeder followed McClain for some time. Transcript, Vol. I, pp. 268, 269. This story is corroborated by the sworn statements of Reeder. Reeder dep., pp. 65–67.

The Honorable Michael H. Eldred, judge of the Vigo Superior Court, gave testimony we find relevant to this incident. According to Judge Eldred, the Respondent stopped into Judge Eldred's chambers during this time period and stated that something odd had happened to him. According to Judge Eldred, Respondent told him that on the previous weekend, he had received an anonymous phone call stating that there was "some trouble" in the general area of Maple and 11th, that he drove to the area, that he saw Laura Hauser coming out of her house with her boyfriend, and that he then left and filed a police report. Transcript, Vol. II, pp. 60–62.

The Honorable Dexter Bolin, Jr., judge of the Vigo Circuit Court, also testified at the hearing. He too expressly recalled talking to the Respondent about the incident. According to Judge Bolin, Respondent came into his chambers and related that he had received an anonymous phone call advising him of trouble around 10th and Maple, that he went up there and drove around, that he spotted Laura Hauser and Jeff Reeder coming out of an apartment, and that he then left the area and filled out a police report. Transcript, Vol. III, pp. 8–9.

Respondent testified at the hearing that it was his position the incident at 11th and Maple never occurred. Transcript, Vol. III,

p. 270. Respondent denies ever having received an anonymous call triggering him to travel to 11th and Maple. McClain dep., pp. 31–32, 34–35; Transcript, Vol. III, p. 268. Respondent also denies telling anyone about such an anonymous phone call and denies filling out a police report. Transcript, Vol. III, pp. 268–70.

Respondent has suggested that Judges Eldred and Bolin heard of the incident from another individual named Brad Kesler, who was for a brief period of time the director of the corrections center. Transcript, Vol. III, pp. 270–71; Respondent's Brief, pp. 52–53, 58. The suggestion is that perhaps the judges are confused about who told them about the incident.

However, Judge Bolin expressly stated that it was Respondent who came into his chambers and related the tale about an anonymous call and seeing Hauser and Reeder near 11th and Maple. Transcript, Vol. III, pp. 8–9. He affirmed his recollection on cross-examination. Transcript, Vol. III, pp. 29–30. In fact, Judge Bolin stated he remembered the incident because he could not understand why Respondent was telling him these things and that "it seemed bizarre." Transcript, Vol. III, p. 30. Judge Eldred was also quite specific in his recollection that Respondent had related the story of the anonymous call, the seeing of Hauser and her boyfriend, and the filing of a police report. Judge Eldred even remembered the chair in which Respondent was sitting. Transcript, Vol. II, pp. 60–61. Further, on cross-examination, Judge Eldred expressly denied he heard about this incident from Brad Kesler, testifying that, "[T]he way it occurred is exactly as I have just testified, Judge McClain reported this to me." Transcript, Vol. II., pp. 77–78.

We agree with the Masters that Hauser observed Respondent in the vicinity of 11th and Maple, near her apartment, and that she and Reeder followed his vehicle. Finding 23. We also find clear and convincing evidence that in the general time frame in which Respondent was observed outside Hauser's apartment and was followed, Respondent falsely told both Judges Eldred and Bolin

that he had received an anonymous phone call alerting him to alleged trouble near Maple and 10th or 11th. We also find clear and convincing evidence that Respondent told both judges that he went to the intersection and there observed Laura Hauser and her boyfriend, and later falsely denied having said or done this.

We find this evidence, taken in its totality, convincingly shows Respondent knew he had been spotted outside Hauser's apartment and followed, that Respondent had reason to try to conceal his presence in that location, and that he therefore concocted the anonymous phone call story in an attempt to explain what he was doing near Hauser's apartment, should some allegation to that effect be made.

Further, the evidence shows clearly and convincingly that not only did Respondent have an interest in Hauser that went beyond mere employer-employee relationship, the nature of that interest was such that Respondent felt he should keep it hidden, to the point he would lie to fellow judges in order to cover-up this interest.

These findings do not reflect well on Respondent's credibility. We note also that Respondent has testified that he did not know who Hauser was dating during the time she worked for the corrections center. McClain dep., p. 27. In his answer to the formal charges, respondent asserted he could not identify Reeder. Answer, p. 5. Yet Judge Eldred testified Respondent told him he had seen "Laura Hauser *and her boyfriend.*" Transcript, Vol. II, p. 61. Judge Bolin testified Respondent told him he had seen "Laura Hauser *and Jeff Reeder.*" Transcript, Vol. III, p. 9. The plain inference is that Respondent knew more about Hauser and who she was dating than he has been willing to admit, even under oath. Further, Respondent testified he never told Hauser she would fit in well with his family. Transcript, Vol. III, p. 210. Yet the Masters expressly found that he *had* made such a statement. Finding 27.

The Masters found Respondent has a reputation in the community for truthfulness and honesty. Credibility Finding 8. However, this does not preclude a finding of specific instances of dishonesty in his testimony, and we find that Respondent was untruthful concerning his conduct and relationship with Hauser.

In this general time frame, Hauser and her father received anonymous phone calls making derogatory comments about Reeder. Findings 28, 29. Hauser testified, and the Masters agreed, that she received a call "suggesting that Jeff Reeder didn't love her and that she should leave him alone." Finding 28. Hauser's father received two anonymous calls, one from a male and one from a female making defamatory statements about Reeder. Finding 29. Significantly, one of the calls suggested that Reeder was "loose with women" and that Mr. Hauser would be "receiving proof in the mail." Finding 29.

Within a month of that phone call to her father, Hauser received an anonymous letter at work. Finding 30. The letter asserted to contain the so-called "proof" that Reeder was being unfaithful to Hauser. Comm.Exh. 2. Enclosed in the letter was a used condom. The writer of the letter suggested, in an exceedingly vulgar way, that Hauser would be able to recognize the condom as belonging to Reeder.

In this same time frame, Hauser's father also intercepted an unsigned letter intended for Hauser's mother which purported to be from a girlfriend of Jeff Reeder. The letter is filled with derogatory comments about Hauser. Finding 30; Comm.Exh. 1. The text of this letter is extremely vile and graphic in its descriptions and comments about Hauser. The author goes to great lengths to make the most painfully cruel and offensive assertions about Hauser. The author could only have intended to hurt Hauser and her family.

Hauser suspected that Respondent was responsible for the hateful communications. Transcript, Vol. I, pp. 275–76. As the Masters noted, many very specific facts about Hauser contained in the communications were known to Respondent. Finding 48. The Masters also noted that others "could have" known some of these things as well. Finding 48. The Masters noted too that Hauser gave conflicting statements about

whether Respondent was responsible for the communications. Credibility Finding 5. However, her differing opinions as to whether Respondent was responsible were expressed before certain additional facts became generally known, are of no particular weight, and are in any event explained satisfactorily by Hauser. It is undisputed that the specific facts known to the author of the letter were known by a "very few people." Transcript, Vol. I, p. 276.

From these events, it is obvious that one or more of the few people who knew certain specific facts about Hauser and her family were using clandestine and repulsive methods to try to "break up" the relationship between Hauser and Reeder. The responsible person or persons were doing so in a manner calculated to be as painful and traumatic to Hauser and her family as possible. The letters use very hateful language in reference to Hauser. Comm. Exh. 1, 2.

Ultimately, in the belief that Respondent was responsible for the vile communications, Hauser asked the Commission to investigate the matter. An investigation ensued, resulting in the filing of formal charges on November 5, 1993. At that time, Respondent denied having any involvement in the contemptible communications to Hauser and her family. Answer, pp. 14–15.

Hauser had saved the condom and gave it to the Commission. At the Commission's request, the State Police performed a laboratory analysis of the condom and was able to reconstruct some DNA strands still present on the condom. When Respondent was finally compelled to submit to a blood test,[4] the lab results confirmed that the semen present in the condom belonged to him. Finding 32.

Because this case was excessively delayed by a dispute concerning the blood test and because we wish to stress the role of cooperation in proceedings of this nature, we take this opportunity to examine the obligation of a judge to cooperate in the investigation and prosecution of a judicial disciplinary proceeding.

■ As we have held in the context of attorney discipline cases, the party being investigated has a duty to cooperate in the process. *In re Allen,* 470 N.E.2d 1312 (Ind. 1984). The failure to cooperate may in itself constitute independent grounds for disciplinary charges in some instances. *Id.* It should not need stating to any judge in this State that the same duty of cooperation exists in judicial disciplinary cases. As the Code of Judicial Conduct makes clear, judges are held to high standards of conduct. Jud.Canon 1. Further, our ethical rules make it clear that all judges and attorneys have a duty to cooperate with the investigative process of a disciplinary agency. Ind.Professional Conduct Rule 8.1. As we noted in *Allen,* the duty to cooperate does not require an admission of misconduct nor does it preclude the advocacy of a theory of defense which is contradictory to the allegations of misconduct. 470 N.E.2d at 1315.

■ We draw no inference of guilt from Respondent's lack of cooperation with the discovery process. The Court simply takes this opportunity to stress that cooperation with the investigative and discovery processes is expected of any judge under investigation by the Commission and that in the proper case, the failure to cooperate could in itself constitute actionable misconduct. On the other hand, Respondent's uncooperative conduct and delay tactics crossed the line be-

---

4. The Commission asserts, and Respondent does not deny, that even before the filing of formal charges in November of 1993, while this matter was still in the confidential investigative stage, it asked Respondent for a blood sample to allow a comparison of the Respondent's DNA to that recovered by the State Police laboratories from the condom. Although a finding that the semen in the condom did not belong to him might have ended the investigation before charges were filed, Respondent refused to submit to a blood test. Later, after charges were filed, the Commission made a formal request for a blood sam-

ple under the applicable rules of discovery. The Commission's request was alternatingly agreed to and resisted. Ultimately, protracted litigation of the issue was resolved by an order from this Court dated August 17, 1995. On the last possible day, Respondent complied with this Court's order. We note also that a DNA report prepared by Respondent's expert should have been provided to the Commission but Respondent refused to provide the report until ordered to do so by this Court after the hearing before the Masters had already concluded.

tween legitimate discovery dispute and the sort of conduct which is not only antithetical to Respondent's obligations as an attorney and judge, but calls into question the integrity of the judicial disciplinary process.

Fast on the heels of this incriminating blood test evidence and just before this matter was to proceed to a hearing before the Masters, there arose a new "alibi" witness who had kept silent throughout the almost two years this matter had been public knowledge.

Thomas McQueary is a distant relation of Respondent. The two met in the early eighties, prior to when Respondent became a judge, and became good friends. Transcript, Vol. III, p. 51. As an attorney, Respondent represented McQueary in McQueary's divorce. Transcript, Vol. III, p. 51. McQueary came to work at the corrections center in 1990, initially as the assistant director and later, in March of 1991, as its director. Findings 5, 14.

During the time period McQueary worked at the corrections center, he and Respondent went to lunch almost every day. Transcript, Vol. III, p. 55. The two took a vacation trip together to Florida. Transcript, Vol. III, p. 58. Ultimately, McQueary would resign his position as director following criminal charges of official misconduct to which he pled guilty. Transcript, Vol. III, pp. 101–02. Judge Bolin testified that Respondent "defended his cousin Tom McQueary by publicly excoriating the women in the program who had brought the charges against him." Transcript, Vol. III, p. 39. Judge Bolin recalled that at a press conference, Respondent referred to the women as "sluts." Transcript, Vol. III, p. 39.

While serving as the corrections program director, McQueary met Hauser. He claims to have established a personal relationship with her as well as professional, stating: "Like a brother-sister relationship. We was pretty close." Transcript, Vol. III, p. 53.

McQueary also claims a dislike for Reeder, then Hauser's boyfriend, based upon some incidents between the two "in the eighties." Transcript, Vol. III, p. 46. McQueary testified he was unhappy about some comments allegedly made by Reeder to McQueary's daughter and her friend. Transcript, Vol. III, p. 78. But the main reason he was mad at Reeder was that Reeder allegedly stole McQueary's guitar. Transcript, Vol. III., p. 78. According to McQueary, he found out that Hauser was dating Reeder while working with Hauser at the corrections center and got "kind of upset." Transcript, Vol. III, p. 53.

Against this background we now summarize the testimony given by McQueary at the hearing in this case.

Because of his dislike for Reeder and to "get even" with him for these earlier incidents, McQueary supposedly concocted a plan to "create a problem" in Reeder's relationship with Hauser. Transcript, Vol. III, pp. 64, 75. McQueary testified he was "angry at Reeder [and] wanted to break them up." Transcript, Vol. III, p. 81. According to McQueary, it was he who authored the loathsome letters which were sent to Hauser and her family. In order to get the letters in a woman's handwriting, he enlisted the aid of a male friend who in turn enlisted the aid of a woman with whom the friend worked. Transcript, Vol. III, p. 65.

McQueary describes the following course of events as to the sending of the condom. He found the condom in a wastebasket in his home and "thought it was his own." Transcript, Vol. III, p. 67. He put the condom in a sandwich bag, drove it to a friend's house, and gave the friend a draft of a letter to write to Hauser. Transcript, Vol. III, pp. 90–92. According to McQueary, the friend and the other woman enlisted to help thought it was all a "practical joke." Transcript, Vol. III, p. 88.

The friend who purportedly assisted McQueary is now deceased and unable to corroborate this story. Transcript, Vol. III, p. 78. The name of the woman who allegedly assisted in this vulgar venture unfortunately "escapes" McQueary. Transcript, Vol. III, p. 78.

Of course, the condom contains Respondent's sperm cells, not McQueary's. Finding 32. Having continuously denied any knowledge whatsoever concerning a condom being

sent to Hauser, at the hearing Respondent offered the following explanation about how his used condom found its way into McQueary's wastebasket. During a time period in which McQueary was in Tulsa, Oklahoma, Respondent was apparently asked to feed McQueary's dog. Transcript, Vol. III, p. 67. Respondent was given a key to McQueary's home. Transcript, Vol. II, p. 67. Thereafter, according to his own testimony, Respondent had sexual relations with women several times at McQueary's house. Transcript, Vol. III, pp. 214–15. After having sex, Respondent allegedly would deposit his used condoms in McQueary's wastebasket. Transcript, Vol. III, pp. 215–16. Respondent offered no witnesses to corroborate this testimony.

In asserting this "McQueary defense," Respondent asks this Court to believe that in furtherance of a plot to get even with Reeder for some old grudges, McQueary took a used condom out of his wastebasket which he thought to be his own but which had actually been put there by Respondent, who was using McQueary's house for sexual liaisons while McQueary was on a trip to Tulsa; McQueary then put the condom in a sandwich bag, delivered it to a now deceased friend, who then had an unnamed female write an obscene note purportedly dictated by McQueary, after which the whole disgusting package was put together and sent to McQueary's friend, Hauser, with the dead and unknown co-conspirators thinking it was all a practical joke.

Respondent asks the Court to believe that McQueary kept all this a secret from everyone during the almost two years Respondent was being publicly charged with harassing Hauser and suspended from serving as judge. Apparently, neither of his conveniently unavailable co-conspirators thought to come forward to exonerate the Respondent by pointing the blame at McQueary either. McQueary himself came forward only after the newspapers published an article indicating that Respondent was going to be required to take a blood test. Transcript, Vol. III, p. 74.

We are asked by Respondent to believe that McQueary decided to speak up even though he thought the condom was his and did not belong to Respondent. McQueary asserts he decided to call Respondent and "confess" because he thought the tests would show the condom to have Respondent's DNA on it due to the fact the two of them were distantly related. Transcript, Vol. III, p. 74 (One of Respondent's grandmothers and one of McQueary's grandmothers were sisters. Transcript, Vol. III, p. 51). According to McQueary, he then called the Respondent to tell him that it was he who sent the letters and condom to get even with Reeder, stating to Respondent, "You know how I am, I always like to get even with people." Transcript, Vol. III, p. 75.

Respondent asks us to believe that McQueary engaged in this complex and ludicrous scheme to "get even" with Reeder despite having a close "brother-sister" relationship with Hauser. Yet the letters sent to Hauser and her parents which he claims to have authored are utterly vile and repulsive in their references to Hauser, and were obviously designed to be offensive and hurtful to Hauser and to members of her family. The graphically sexual and sick-spirited language and overall meanness of the tone of the letters are totally inconsistent with McQueary's claim of closeness and caring for Hauser.

Respondent asks us to believe McQueary's claim to have been motivated to engage in this degrading course of conduct in order to get even with Hauser's boyfriend over a long-standing grudge he bore against him about a stolen guitar and some comments made by Reeder to McQueary's daughter; to believe his co-conspirators in this nightmarish escapade thought this *a practical joke,* and are now either dead or their names forgotten; and to believe McQueary never told his friend, vacation partner, and almost daily lunch companion or the Commission about any of this—either before or during the prosecution of Respondent.

The "McQueary defense" breaks down completely with Respondent's claim that his own used condom became involved in this case by mere coincidence arising from Respondent's untimely use of McQueary's house for sexual liaisons. We are asked to believe

it was just Respondent's bad luck that both he and McQueary were having sex with unidentified persons in McQueary's house and both depositing their used condoms in the same bathroom wastebasket at McQueary's house during the same general time frame, and that it was Respondent's condom, rather than McQueary's, which was inadvertently plucked out for purposes of harassing Hauser and Reeder. Respondent asks us to believe that he had no knowledge or involvement in any of this.

Respondent advances this incredible tale, without corroborative evidence of any kind in the form of testimony from any of McQueary's or Respondent's alleged sexual partners, or from anyone who knew McQueary or his now deceased co-conspirator, or from the alleged female letter-writer herself, whose name "escapes" McQueary.

The Masters made no finding as to the credibility of McQueary, Respondent, or of this story. However, we find this eleventh hour tale of vengeance and coincidence to be unbelievable and the two perpetrators of this story to lack credibility.

The Masters made no finding as to who was actually responsible for the offensive calls, letters, and the condom. They found only that McQueary "admitted that he placed the used condom in the letter to Laura Hauser," and that McQueary "admitted he obtained a used condom from the bathroom wastebasket in his home." Findings 46, 47. These findings of the Masters reciting the content of McQueary's testimony, but not embracing its accuracy, in no way preclude a finding that McQueary's story is untruthful and that it was Respondent who masterminded the offensive activity complained of by the Commission.

After reviewing and adopting the findings of the Masters and making our own findings based upon the evidence of record, we are left with a firm and certain conviction that Respondent intentionally participated in the harassment of a court employee and her family. We find it wholly incredible that his own used condom found its way into Hauser's mailbox without Respondent's knowing participation in the process.

## Conclusions

The Commission made certain allegations which the Masters concluded had not been proven by clear and convincing evidence. In particular, the Masters concluded the Commission failed to prove by clear and convincing evidence that Respondent had referred to Laura Hauser as his private stock; or that Respondent asked Brad Kesler, at that time the director of the corrections center, to arrange a date with Hauser; or that he asked Kesler to break up the relationship between Hauser and Reeder; or that he asked Kesler to plant drugs or stolen property in Reeder's vehicle. Conclusion 2. We agree with and adopt this conclusion.

■ The Masters also found the Commission failed to prove by clear and convincing evidence that the hiring of Hauser and the giving of gifts to Hauser violated Canons 1 and 2 of the Code of Judicial Conduct. Conclusion 3. We agree there was insufficient evidence of wrongdoing with regard to Hauser's hiring. With regard to the gift giving, we are loathe to lay down a rule prohibiting the giving of gifts to employees by judges. Nevertheless, it is not hard to imagine circumstances in which personal gift giving, especially fairly large monetary gifts, could be viewed as a form of unwanted attention.

With regard to the conduct of judges toward court staff and all others with whom the judge comes in contact, we find the words of the Ohio Supreme Court helpful and instructive to all the judges of this State:

> Improper conduct which may be overlooked when committed by an ordinary person, or even a lawyer, cannot be overlooked when committed by a judge. By accepting his office, a judge undertakes to conduct himself in both his official and personal behavior in accordance with the highest standard that society can expect.

*Cincinnati Bar Ass'n v. Heitzler,* 32 Ohio St.2d 214, 291 N.E.2d 477, 482 (1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). This notion is embodied in our Judicial Canons, which state in part, "A judge must avoid all impropriety and appearance of impropriety." Jud.Canon

2(A), *Comments* (amended February 1, 1995).

In this instance, however, we are guided by the Masters' findings that most of the gifts given to Hauser were similar to those given to other court staff members and that he had on occasion helped other staff members with financial difficulties without being asked. Findings 16, 22. We are thus persuaded that official misconduct has not been clearly and convincingly proven with regard to gift giving.

This brings us to the remaining Conclusions 1 and 4, in which the Masters concluded the Commission failed to prove Respondent "wrote or caused to be written" the letters sent to Hauser and her family or "that he made or caused to be made" the harassing phone calls, and that he had not committed any misconduct. However, as noted above, we find clear and convincing evidence that Respondent knowingly participated in the sending of his own used condom and the accompanying letter to Hauser. Respondent's participation in the sending of his condom to Hauser was a follow-up activity to the earlier phone call which had asserted that proof of Reeder's purported infidelities would be forthcoming. The letter accompanying the used condom expressly claimed to be that "proof." Comm.Exh. 2. From this we discern clear and convincing evidence that Respondent also knowingly participated in this particular harassing phone call to Hauser's father.

We therefore conclude that Respondent violated Judicial Canon 1 in that he failed to participate in and preserve the integrity of the judiciary. We further conclude that Respondent violated Judicial Canon 2 in that he failed to act at all times in a manner that promotes public confidence in the integrity of the judiciary. We also conclude Respondent has committed willful misconduct unrelated to the judicial office that brings the office into disrepute. Adm.Disc.R. 25(III)(A)(4).

### Sanction

There remains the issue of the appropriate sanction to impose. Upon a finding of judicial misconduct, the Court may impose removal, retirement, suspension, discipline as an attorney, limitations or conditions on the performance of judicial duties, reprimand or censure, fine, assessment of costs and expenses, or any combination of the above. Admis.Disc.R. 25(IV)(A).

The Commission has recommended that Respondent be removed from the bench and forbidden from *ever* holding any judicial or quasi-judicial office again. Because the Commission has failed to prove all its charges, we are not convinced such a sanction is appropriate. On the other hand, integrity is the essence of the judicial vocation. Respondent's lack of integrity in connection with this matter is demonstrated not only in the conduct for which he is being sanctioned, but also in his advancement of the "McQueary defense" and in his obstructive and uncooperative posture toward the Commission's investigation. Respondent has brought the judiciary into disrepute, has violated the trust of the people who placed him in office, and has been dishonest with the Commission, the Masters, this Court, and the citizens of Indiana. We therefore conclude Respondent's conduct warrants a severe sanction.

It is therefore ordered that effective immediately, William C. McClain is removed as Judge of the Vigo County Court. The Indiana Constitution requires that a "judge so removed by the Supreme Court is ineligible for judicial office and pending further order of the Court he is suspended from practicing law in this State." Ind. Const. art. 7, § 11. Respondent's suspension from the practice of law in this State will remain in effect for a period of no less than two years from the date of this opinion. At the end of that time period, Respondent may petition for reinstatement as an attorney under the applicable rules. The Respondent is further directed to pay the costs and expenses of this action.