**In the Matter of Joseph G. EDWARDS, Judge of the Delaware Superior Court.**

Nos. 18S00–9706–JD–361, 18S00–9709–JD–482.

Supreme Court of Indiana.

May 1, 1998.

Kevin McGoff, Indianapolis, for respondent.

Margaret W. Babcock, Indianapolis, in Cause No. 18S00–9706–JD–361, Donald R. Lundberg, Indianapolis, in Cause No. 18S00–9709–JD–482, for Judicial Qualifications Commission.

## JUDICIAL DISCIPLINARY ACTION

## PER CURIAM.

### I. Introduction

These consolidated causes come before the Court as the result of judicial disciplinary actions brought by the Indiana Commission on Judicial Qualifications ("Commission") against the Respondent herein, Joseph G. Edwards.[1] This Court has jurisdiction pursuant to Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25.

Respondent was admitted to the Indiana bar in January of 1983. He practiced law either on a full-time or part-time basis from January 1983 through December 31, 1996. Respondent served as appointed part-time commissioner for the Delaware Superior Court 4 from July 1, 1983 to May 15, 1996.

He served as appointed part-time probate commissioner of the Henry Circuit Court from January 1, 1989 to mid-December 1996 and from time to time he also served as judge *pro tempore* for that court. As will be developed more fully below, Respondent was also appointed to serve as the full-time judge *pro tempore* of Delaware Superior Court 4 from May 16, 1996 through November 15, 1996.

In 1996, Respondent was elected judge of Delaware Superior Court 4 and began his term of office January 1, 1997.

The Commission filed its Notice of the Institution of Formal Proceedings and Statement of Charges on July 1, 1997 in Cause No. 18S00–9706–JD–361. Thereafter, this Court entered an order appointing three distinguished trial judges to serve as Masters in the proceeding. The Masters' role is to hear evidence relating to the charges and to report their findings and conclusions to the Court. Admis.Disc.R. 25(VIII)(I).

On August 12, 1997, the Commission filed an amended charging instrument in the above referenced cause, and filed another set of charges against Respondent in Cause No. 18S00–9709–JD–482. On August 16, 1997, this Court issued an order appointing the same Masters to hear and take evidence on the second set of charges.

The Masters conducted a consolidated trial on the two causes.[2] Respondent appeared in person and by counsel. Evidence was presented by both sides.

Promptly thereafter, the Masters submitted a report of their findings and conclusions. Admis.Disc.R. 25(VIII)(N). The Commission filed its recommendation as to the appropriate disposition of the actions. Admis.Disc.R. 25(VIII)(O). Respondent filed a petition for review and brief in support setting forth his objections to the report of the Masters. This Court then undertook its review of the two causes.

---

**1.** At the time charges were filed against him by the Commission, Respondent was the elected Judge of Delaware Superior Court 4. He resigned from that office on February 24, 1998.

**2.** The trial conducted by the Masters included the taking of testimony from thirty-two witnesses

and the review and admission of fifty-five exhibits. The trial took place over a three-day period. The Court wishes to express its gratitude to the Masters for their service, diligence, and thoughtful work in presiding over these causes.

■ The Masters submitted a thorough report. They concluded that the charges against Respondent in both causes were proven by clear and convincing evidence, and recommended specific sanctions for the many ethical violations committed by Respondent. The recommended findings of fact and conclusions of the Masters are not binding upon the Supreme Court. Admis.Disc.R. 25(VIII)(N)(1). Our review of the Masters' report is *de novo. In Re Drury,* 602 N.E.2d 1000, 1002 (Ind.1992). In this case, however, we adopt all the findings of fact and most of the conclusions of law of the Masters. We will separately address the appropriate sanction.

■ The pertinent facts found by the Masters to have been clearly and convincingly proven are summarized below. In some instances, the factual testimony of Respondent was in conflict with the testimony of others. In their report, the Masters expressly stated, "Wherever in the record of proceedings, the testimony of Judge Joseph G. Edwards contradicts the testimony of other witnesses we find that his testimony regarding such matters is less credible than the testimony of the other witnesses." The Masters were in the best position to observe and assess witness credibility and their judgment in reconciling conflicting evidence carries great weight. *See generally, Matter of Frosch,* 643 N.E.2d 902, 904 (Ind.1994) (Hearing officer's judgment in assessing credibility of witnesses where testimony is in conflict in a disciplinary proceeding is entitled to great weight). In any event, based upon our review of the record, we also concur in this finding.

## II. Cause Number 18S00–9706– JD–361 ("Cause 361")

### A. Cause 361—Count One

#### 1. Cause 361—Count One— Factual Findings

In January 1991, Respondent agreed to represent Penny Adkins Lambert in the dissolution of her marriage to Michael Lambert. Michael Lambert was a suspect in the murder of a Muncie police officer and was incarcerated at that time. Penny Lambert was eighteen years old when she consulted with Respondent about her divorce.

At the time she decided to divorce Michael Lambert, Ms. Lambert frequented an establishment in Muncie called the Southside Gun Shop. Respondent had on other occasions represented the owner and two employees of the Southside Gun Shop. Ms. Lambert told Jim Crowder at the Southside Gun Shop that she did not have money for a divorce or for an attorney.

Crowder referred Ms. Lambert to Respondent to serve as her lawyer. She then made an appointment in early 1991 to see Respondent about a divorce. Based on the referral from Crowder, Ms. Lambert's expectation was that she would pay Respondent for any legal services with sexual favors.

Respondent agreed to represent Penny Lambert in a divorce proceeding and he did in fact file a dissolution petition on her behalf in Delaware Superior Court 3 on January 4, 1991. Ms. Lambert had sexual relations with Respondent in exchange for this representation and she continued to have a sexual relationship with him until sometime in 1994.

On occasion, Respondent gave Ms. Lambert cash in exchange for sex and also on occasion he gave her cash when no sex occurred. Respondent told her to use a different last name than Lambert when she called his office and she complied with this request. Respondent told Ms. Lambert that if anyone ever asked how she paid for his services, she should state that her father had paid.

After initially filing the dissolution petition on behalf of Ms. Lambert in Delaware Superior Court 3, Respondent subsequently requested and obtained its dismissal days later on January 17, 1991. Early in 1991, two newspaper articles apparently were published about Michael Lambert and the police officer shooting in which it was mentioned that Lambert's wife had sought a divorce in Delaware County and that Respondent was her lawyer.

Subsequent to the dismissal of the petition, Respondent had another discussion with Penny Lambert, advising her that he would obtain a divorce for her in Henry County be-

cause of her last name and the publicity in Muncie.

Around March of 1992, Respondent gave Ms. Lambert what appeared on its face to be a legitimate divorce decree from the Henry Circuit Court. The document purported to grant her a divorce from Michael Lambert and to give Ms. Lambert legal custody of her child.[3]

The purported dissolution and custody decree facially appears to have been issued by the Henry Circuit Court. The cause number on the document is 33CO1–9201–DR–004. The clerk's file stamp over the cause number indicates the document was purportedly filed with the court on March 13, 1992. The purported decree is comprised of one single sheet of paper, in three connected sections. The third section contains the signature stamp of Respondent as if recommending approval of the decree in his capacity as part-time commissioner in that court. It also contains the signature stamp of the Circuit Court Judge, John Kellam, as if ordering the dissolution.

The document has no legal validity and is a fraudulent document. The cause number on the decree is a cause number assigned to another, unrelated case. No Lambert dissolution petition had been filed in Henry County prior to March 13, 1992, the purported date of the dissolution.

File stamps were generally accessible to officials and employees of the Henry Circuit Court, to the Henry County Clerk's office, and to Respondent. Neither the clerk nor Judge Kellam authorized the use of their file stamps on the document. The decree is on a form generally available in the offices of the Henry County Clerk and is the same general form signed and dated by Respondent on other occasions in recommending or ordering final decrees of dissolution.

The date line relating to the date of the judges' purported actions is filled in with the handwritten numbers and words "13," "March," and "92." Sgt. Frederick Panhorst of the Indiana State Police, a handwriting

analysis expert, testified conclusively that the handwritten word "March" on the fraudulent decree was written by the same person whose handwriting was on the exemplars he analyzed. The exemplars used by Panhorst were taken from a collection of valid decrees and orders from the Henry Circuit Court in 1992 and 1993, each bearing the handwritten word "March." The parties stipulated that the handwritten word "March" on the exemplars was in Respondent's handwriting.

Respondent admitted that the handwritten word "March" on the fraudulent decree is in his handwriting. Although Respondent denied that the number "13" preceding the word "March" on the fraudulent decree is in his handwriting, Panhorst testified that the number "13" and the word "March" were written in ink from the same ink formula.

We agree with the conclusion of the Masters that Respondent was responsible for the preparation of the fraudulent dissolution decree.

Respondent advised Penny Lambert that this document represented that she had legitimately been divorced in the Henry Circuit Court and that she had been awarded custody of her child. Ms. Lambert believed Respondent's misrepresentations about her divorce and the child custody order. Respondent also advised Ms. Lambert he would notify Michael Lambert, who was incarcerated, about the divorce. Penny Lambert herself sent word to her husband that they were divorced.

The fake decree surfaced sometime later during an adoption proceeding in Delaware Superior Court involving Penny Lambert's child. At that time, the decree was revealed to be fraudulent. Judge Kellam would ultimately find out about the fake decree and question Respondent about it. Respondent's story, as expressed to Judge Kellam at the time, was that "someone" had taken and misused a signature stamp.

Judge Kellam told Respondent that he should not use Judge Kellam's signature stamp on documents on which he was recom-

---

**3.** The original of the document was not admitted into the record but was available to the Masters and witnesses at the hearing. A copy of the document was admitted into evidence and is identified in the record as Exhibit F.

mending actions to be taken by the judge because, in effect, he was approving his own recommendation. Respondent told Judge Kellam he had not used his stamp in that way. However, Respondent did subsequently use Judge Kellam's signature stamp inappropriately on some probate documents.

Upon discovering that the decree was of no legal effect and that she had not actually been divorced in Henry Circuit Court, Ms. Lambert contacted Respondent. He advised her that there may have been a glitch in the computer system causing the decree to become lost. Respondent told Ms. Lambert he needed some information from her to put the divorce back in the computer and he dictated to her what to write down.

On January 4, 1994, Respondent appeared in the office of the Henry County Clerk's office and presented a handwritten dissolution petition relating to the Lambert marriage. The contents of this handwritten petition were dictated to Penny Lambert by Respondent and are in her handwriting, although she did not know it was to be filed. Although Respondent himself brought the petition into the Clerk's office and paid the $55.00 filing fee, his name appears nowhere on the petition.

At the time of the filing, Henry County Deputy Clerk Anita Dalton inquired of Respondent about the propriety of a part-time commissioner filing a pleading in Henry Circuit Court. Respondent advised her he would "get out of the case." Dalton indicated to Respondent that the handwritten petition was "junk," and he responded, "Maybe so, but ... she really needs to get it filed."

Telephone records show that a call was made to Penny Lambert's residence from Respondent's line at the Henry Circuit Court on the day the petition was filed. Similar calls are reflected in the telephone records for other dates in early 1994. Ms. Lambert testified that she had given her telephone number to Respondent and that she would not have been receiving calls from anyone else in the Henry County court system. The telephone calls are consistent with Ms. Lambert's testimony about the duration of her relationship with Respondent.

On March 1, 1994, Judge Robert Barnet of Delaware Superior Court 1 presided over a proceeding in which the state sought to terminate the parental rights of Penny Lambert in order to make her child available for adoption. Ms. Lambert was present at the hearing. Ms. Lambert had discussed the hearing with Respondent after it was scheduled and asked him if he knew any way she could get her son back. Respondent told Ms. Lambert he knew Judge Barnet and that he played cards and had dinner with him sometimes. Respondent indicated he would talk to Judge Barnet and "see which way he was going to lean."

During the adoption hearing, Penny Lambert referred Judge Barnet to the fraudulent decree containing the purported custody decree and advised Judge Barnet that Respondent had represented her in obtaining her divorce and legal custody of her child. Ms. Lambert told Judge Barnet during the hearing that the divorce decree was "not in the computer" and was being redone.

Judge Barnet ultimately entered an order terminating Penny Lambert's parental rights and granting the adoption. After losing her child in the adoption, Ms. Lambert discontinued the relationship with Respondent.

During the termination hearing, Judge Barnet observed that Respondent's signature stamp was on the decree, whereas Penny Lambert had indicated Respondent was her attorney. After the hearing, Judge Barnet investigated the validity of the decree and determined that the cause number was that of another unrelated case.

Judge Barnet contacted and met personally with Respondent. Judge Barnet asked Respondent if he had represented Penny Lambert, and he said he had not. Judge Barnet asked Respondent to go back to his office and check his files. Respondent later called Judge Barnet and stated that he found no file indicating he had represented Penny Lambert.

Judge Barnet then wrote a letter to Judge John Kellam advising him about the events that occurred during the termination proceeding. He enclosed a copy of the fake decree and advised Judge Kellam about Pen-

ny Lambert's statements that Respondent had given her the decree in his capacity as her lawyer. Judge Kellam then inquired of Respondent about the decree. Respondent told Judge Kellam that he did not know Ms. Lambert and never had a connection with her.

Only when the dissolution proceeding instituted by the handwritten petition filed by Respondent came before the Henry Circuit Court did Respondent advise Judge Kellam that he had looked at his records and determined he had represented Ms. Lambert in 1991 in Delaware County, at which time Judge Kellam disqualified himself from the case involving the handwritten petition.

Respondent did not advise either Judge Barnet or Judge Kellam of his 1994 contacts with Penny Lambert nor did he tell them that he had prepared the fraudulent divorce decree.

Respondent's denials in 1994 to Judge Barnet and Judge Kellam that he had not represented Penny Lambert were knowingly false and not attributable to any lapse in memory.

In an answer to an interrogatory asking about consultations with Penny Lambert either personally or by telephone, Respondent stated that his contact with Ms. Lambert was limited to two consultations in 1991. This assertion was also false, and Respondent admitted as much at trial.

In sum, Respondent was responsible for the creation of a fake dissolution decree. He provided it to Penny Lambert, his client, with the false representation that she had obtained a divorce and legal custody of her child when in fact neither event had occurred. Respondent lied to Judges Barnet and Kellam about his representation of Ms. Lambert. Respondent performed legal services for Ms. Lambert in exchange for sexual favors. He gave her the impression he might be able to influence or find out confidential information about a termination of parental rights proceeding pending against her before another judge. After falsely advising Ms. Lambert he had obtained a divorce for her, in 1994 Respondent instituted a legitimate divorce action on her behalf

without her knowledge in the same court in which he served as a probate commissioner.

### 2. Cause 361—Count One—Conclusions of Law

■ The facts found with regard to Count One in Cause Number 18S00–9706–JD–361 demonstrate that Respondent violated Rule of Professional Conduct 8.4(b), which provides generally that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer and Rule 8.4(c), which provides generally that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Respondent also violated Rule 3.3, which generally prohibits a lawyer from knowingly making a false statement of material fact to a tribunal, and Rule 8.4(e), which provides generally that it is professional misconduct for a lawyer to state or imply an ability to influence improperly a government agency or official.

Respondent also violated the following Rules of Professional Conduct: Rule 1.1, which provides generally that a lawyer shall provide competent representation to a client; Rule 1.3, which provides generally that a lawyer shall act with reasonable diligence and promptness in representing a client; Rule 1.4, which provides generally that a lawyer shall keep a client reasonably informed about the status of a matter, shall promptly comply with reasonable requests for information, and shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation; Rule 1.7(b), which provides generally that a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's own interests; and Rule 8.4(d), which provides generally that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

The facts found with regard to Count One in Cause Number 18S00–9706–JD–361 also demonstrate that Respondent violated Canon 1 of the Code of Judicial Conduct, which generally requires a judge to uphold the

integrity and independence of the judiciary and Canon 2(A), which generally requires judges to avoid impropriety and the appearance of impropriety and to conduct themselves at all times in a manner promoting public confidence in the integrity and impartiality of the judiciary. Respondent also committed willful misconduct in office and engaged in conduct prejudicial to the administration of justice, grounds for discipline pursuant to Admis.Disc.R. 25(III)(A).

### B. Cause 361—Counts Two, Three, Four, Five, and Six

#### 1. Cause 361—Counts Two, Three, Four, Five, and Six—Factual Findings

Counts Two through Six under this cause all involve, in principal part, assertions of judicial misconduct stemming from Respondent presiding in cases involving parties with whom he had relationships that may give rise to, among other things, an appearance of impropriety or partiality. We have consolidated our discussion of these charges for that reason.

Respondent first met Rita Neal in the spring of 1990. On June 1, 1990, Respondent entered an appearance and a plea of not guilty on behalf of Ms. Neal in a criminal misdemeanor proceeding pending in Marion Superior Court. The record is unclear as to whether the attorney-client relationship ended with that one appearance. We must presume so, in the absence of findings to the contrary. However, another form of relationship would later become established.

Respondent began an intermittent sexual relationship with Ms. Neal in early 1992. In a statement given in 1996 to law enforcement authorities, Rita Neal described her relationship with Respondent by stating that he had represented her in a legal matter, then "started flirting with [her]," that she had "been seeing him ever since." She further stated that the relationship was sexual in nature. Around March of 1996, Respondent started helping Neal financially. Ms. Neal stayed in various hotels and Respondent often paid for her room. Ms. Neal testified that between May and November, 1996, Re-spondent gave her between $300.00 and $500.00 most weeks.

In November, 1996, Respondent and Rita Neal were stopped by the police in Henry County while they were driving in Respondent's vehicle. Rita Neal was then arrested on an outstanding warrant. In statements made to Henry County law enforcement officers in February, 1997, Respondent admitted to having a sexual relationship with Rita Neal that continued through the November date in 1996 when they were stopped in his vehicle.

Against this backdrop of an entangled legal and personal relationship, we examine two instances in which Respondent presided in cases involving Ms. Neal.

On October 24, 1991, in his capacity as a part-time commissioner in Henry Circuit Court, Respondent presided over a child visitation dispute in which Ms. Neal was a party, along with her former husband, Allen Neal. Present at the hearing were Ms. Neal, her attorney Jeff Galyen, Allen Neal, and his attorney.

The issues remained pending before Respondent for many months. Allen Neal became concerned about why there had been no ruling for a long period of time so he had a conversation with Rita Neal. During that conversation, Ms. Neal advised him that she "knew the judge." Allen Neal became frustrated, retained a new attorney, and the case was ultimately decided by Judge John Kellam.

Thus, the evidence shows Respondent had an attorney-client relationship with Rita Neal that had been established just a little more than a year prior to Neal appearing before him as a judge. A sexual relationship later developed, but it is not completely clear from the record whether there was overlap between the commencement of the sexual relationship between Respondent and Ms. Neal and his presiding in the child visitation dispute involving her. At no time did Respondent disclose to Allen Neal or his attorney that he had any kind relationship with Rita Neal nor did he disqualify himself from a case in which she was a litigant.

This was not the last time that Ms. Neal would appear as a party in a case pending before Respondent.

On September 6, 1996, Respondent was presiding in the Henry Circuit Court when a Title IV–D case involving Rita Neal was called. The prosecutor was attempting to collect child support from Rita Neal on behalf of Allen Neal. Rita Neal did not appear on that date and attempts to serve her had been unsuccessful. Respondent commented to the prosecutor in passing that he "knew the family" and Rita would be hard to find. The case was continued by Respondent due to lack of service on Rita Neal.

Other than stating in passing that he knew the family, Respondent made no disclosure to the prosecutor about his relationship with Rita Neal nor did he disqualify or indicate he would disqualify himself from the case.

On December 13, 1996, Respondent was presiding in the Henry Circuit Court and was appointed and qualified as judge *pro tempore* in the same Title IV–D case discussed above. The case against Rita Neal was continued on that date on the prosecutor's motion. Similarly, on this occasion, Respondent made no disclosure to the prosecutor about his relationship with Rita Neal other than having said at one point that he knew the family.

The Commission clearly and convincingly proved that Respondent had an intimate sexual and financial relationship with Rita Neal prior to and while presiding over a case involving her in 1996. Respondent also had previously represented Ms. Neal in an unrelated matter in 1990. At no time did Respondent disclose these relationships to the litigants nor did he disqualify himself from the case.

The Commission also filed charges against Respondent in connection with another occasion in which Respondent's conduct as judge might be called into question.

In 1991, Respondent represented William McDaniel in a support case. Marit McDaniel, William's current wife, testified that she had also consulted with Respondent as her attorney on five to ten occasions in connection with a custody proceeding around 1990 and 1991. The record does not make clear whether Respondent's attorney-client relationship with either William or Marit McDaniel extended beyond 1991. We must assume not for purposes of this opinion.

On November 16, 1994, Respondent, in his capacity as part-time commissioner in the Delaware Superior Court 4, presided over an eviction proceeding captioned *Gibson v. McDaniel*. The plaintiffs—Charles and Virginia Gibson—appeared without counsel. The defendants were William and Marit McDaniel. They also appeared without counsel.

The McDaniels were ordered by Respondent to relinquish possession of the property and a damage hearing was set for December 14, 1994. Respondent made no disclosure to the Gibsons about any prior relationship with Marit or William McDaniel.

On December 14, 1994, the same parties appeared before Respondent and on this occasion the Gibsons were represented by attorney William Lutz, who had entered his appearance that same day. William Lutz submitted evidence to the court on behalf of the Gibsons including a demand letter for $2,841.99 for back rent and damage to the property. Respondent took the case under advisement at the conclusion of the hearing but never ruled on the plea for back rent and damages. Again, no disclosure of any prior representation was made.

Respondent admitted at the trial of this cause that when *Gibson v. McDaniel* came before him, he remembered having previously represented William McDaniel. Respondent denied, however, having ever represented Marit McDaniel. Respondent further claimed he did make a disclosure of the prior representation of William McDaniel and that the parties waived any conflict. The facts proven at trial demonstrate otherwise. Respondent knew he had previously represented William McDaniel and had consulted with Marit McDaniel. He did not disclose this information to the plaintiffs or their counsel nor did he disqualify himself from the case in which the McDaniels were parties.

### 2. Cause 361—Counts Two, Three, Four, Five, and Six—Conclusions of Law

Respondent had separate attorney-client relationships with Rita Neal, William McDaniel, and with Marit McDaniel. In the absence of clear and convincing evidence to the contrary, we have assumed that the attorney-client relationships with these three individuals ended in 1990, 1991, and 1991, respectively. He later presided over proceedings in which those individuals were parties. We emphasize that the proceedings over which Respondent presided were wholly unrelated to the prior representations. Had it been otherwise, Respondent would almost certainly have been obligated to recuse himself by reason of having served as a lawyer in the matter in controversy or by virtue of having personal knowledge of disputed evidentiary facts. *See* Jud.Canons 3(E)(1)(a) and (b).

Whether it is a breach of a judge's ethical responsibilities to preside over a case involving a former client when the case is unrelated to the prior representation is an issue that has been touched on only peripherally in Indiana. In *Hammond v. State*, 594 N.E.2d 509 (Ind.App.1992), the Indiana Court of Appeals held that it was not reversible error, absent a showing of prejudice, for a judge to refuse to recuse himself in a criminal case when he had previously represented the defendant in an unrelated criminal matter. *Id.* at 514. Whether presiding over the case might nevertheless be violative of the Code of Judicial Conduct is, however, a related but separate question from whether it might constitute reversible error. We look to other jurisdictions for guidance.

In California, for example, judges are prohibited from presiding in a case if previously employed as attorney for a party within two years prior to the commencement of the suit. Cal.Civ.Proc.Code § 170.1(a)(2). There are reported cases in other jurisdictions in which prior representation of a party by a judge has been found to require recusal. *See, e.g.,*

*Davis v. Neshoba County Gen. Hosp.*, 611 So.2d 904, 906 (Miss.1992).

However, the much more common and better rule is that prior representation of a party with regard to matters wholly unrelated to the case presently before a judge, or only tangentially related to such matters, does not automatically mandate judicial qualification. Flamm, *Judicial Disqualification—Recusal and Disqualification of Judges* 319–20 (1996).

In our view, the guiding principle applicable to these situations is found in the Code of Judicial Conduct provision stating that a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. Jud.Canon 3(E)(1).[4] This approach is consistent with the general view expressed in scholarly comment on this topic:

> Judges may be prohibited from presiding over cases involving former clients whom the judge represented in unrelated matters. Typically, disqualification in this instance will be required because of a general appearance of partiality rather than specific statutory provisions.

Shaman, Lubet, and Alfini, *Judicial Conduct and Ethics* 130 (2nd ed. 1995).

We therefore hold that it is not improper *per se* for a judge to preside over a case involving a former client. Rather, the inquiry should focus on whether the facts are such that the judge's impartiality might reasonably be questioned. Jud.Canon 3(E)(1). The test for determining whether a judge should recuse himself or herself under this particular Canon is whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality. *Cf. Perkins v. Spivey*, 911 F.2d 22 (8th Cir.1990), *cert. denied*, 499 U.S. 920, 111 S.Ct. 1309, 113 L.Ed.2d 243 (1991).

In the context of a judge who has previously represented a party in an unrelated matter, there are several factors which

---

4. The Code identifies a number of specific situations involving the appearance of partiality that a judge must expressly avoid. *See* Jud.Canon 3(E)(1)(a) through (d). It is not clear from the evidence that any of these express provisions are applicable. Therefore, we examine Respondent's conduct from the standpoint of the more general principle articulated above.

are relevant to determining whether there exists a reasonable basis for doubting the judge's impartiality. Relevant considerations would include the nature of the prior representation, the duration of the attorney-client relationship, the extent to which the prior representation might in some limited way be related to the current case, and the lapse of time between the prior representation and the appearance of the former client before the judge. *See generally* Flamm, *supra,* at 320–21 and cases cited therein.

We further note that the commentary to the Code of Judicial Conduct also states: "A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." Jud.Canon 3(E)(1) (commentary, in part). This commentary reveals a separate obligation to disclose that is broader than the duty to disqualify.

■ The fact that a presiding judge previously represented one of the parties in an unrelated matter might be considered relevant to the question of disqualification. We therefore hold that a judge faced with such a situation generally should inform the parties and make a factual record of the prior representation. We are reluctant to lay down a hard and fast rule that all prior representations must always be disclosed. There are situations wherein the prior representation was so remote in time and nature that the judge can be confident that the prior representation could not reasonably be perceived as raising any question about the judge's impartiality. However, the better practice if there is any doubt would be for the judge to simply make a record of the prior representation.

■ If a party then makes a motion for disqualification, the judge is not necessarily obligated to recuse. The law presumes that a judge is unbiased in the matters that come before the judge. *Smith v. State,* 535 N.E.2d 1155, 1157 (Ind.1989). The judge will have to make a determination as to whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality and proceed accordingly.

■ We now apply these holdings to the facts of this case. Respondent had represented Rita Neal for a brief period of time in 1990 as part of a criminal misdemeanor proceeding in Marion County. Then, on October 24, 1991, in his capacity as a part-time commissioner in Henry Circuit Court, Respondent presided over a child visitation dispute in which Ms. Neal was a party. In 1996, Respondent also presided over a case in which the prosecutor was attempting to collect child support from Ms. Neal.

Thus, the prior representation was in a criminal misdemeanor proceeding completely unrelated to the support proceedings over which Respondent presided, and appears to have involved only an appearance and the entry of a not guilty plea. The hearings over which Respondent presided were, respectively, one year and five years after the earlier representation. We find that Respondent was not obliged to disqualify himself nor to necessarily disclose the prior representation.

■ We reach a similar conclusion with regard to the prior representations of William and Marit McDaniel. The record reflects that Respondent represented them separately in 1991 with regard to certain child support and custody issues. There was insufficient evidence of any attorney-client relationship beyond that date. Three years later, Respondent presided over a completely unrelated landlord-tenant dispute involving the McDaniels. This evidence does not clearly and convincingly support a finding of a breach of the Code of Judicial Conduct as to this particular count.

■ We note that judges *pro tempore* are especially susceptible to problems in this area because, unlike full-time judges, they often will have ongoing law practices. We stress that as a general proposition, judges serving *pro tempore* should disclose prior attorney-client relationships because it may be unclear whether or when any attorney-client relationship with a party may have come to an end.

■ Our final legal conclusion, however, is that Respondent did commit ethical violations in presiding over the 1996 child support proceedings involving Rita Neal. The violations occurred not because of his prior legal representation of Ms. Neal, but because he had a current and ongoing sexual relationship with her and was contributing financially to her support at the time of the proceedings. Respondent's impartiality was certainly open to question for those reasons, and he therefore violated Judicial Canon 3(E)(1). We also find such conduct in violation of Canon 1, which generally requires judges to uphold the integrity and independence of the judiciary and to avoid the appearance of impropriety. Respondent also committed willful misconduct in office and engaged in conduct prejudicial to the administration of justice, grounds for discipline pursuant to Admis.Disc.R. 25(III)(A).

### C.  Cause 361—Count Seven

#### 1.  Cause 361—Count Seven— Factual Findings

Colleen Cox was acquainted with Respondent since their attendance at the same high school in Muncie, Indiana. Ms. Cox and her former husband, Joel Harney, were divorced in the Delaware Superior Court 3 in 1988. Respondent entered an appearance on behalf of Ms. Cox on August 7, 1992. Beginning January, 1993, the parties had a series of post-dissolution disputes regarding support, custody, and visitation of their two children. By 1993, Ms. Cox was living in Idaho and the two children of the marriage visited their father in Indiana in the summers.

In July 1993, Ms. Cox traveled to Indiana to pick up the children. Respondent petitioned the Delaware Superior Court 3 on her behalf for an order requiring Joel Harney to return the children to her.

Respondent appeared in court again for Ms. Cox on August 18, 1993, in a contempt hearing against Joel Harney relating to his obligation to return the children. In 1994, Joel Harney petitioned for child custody and Respondent filed a motion to dismiss the petition on behalf of Ms. Cox.

After a hearing on August 3, 1994 in which Respondent and Ms. Cox again appeared, the matter went through a change of judge and remained under advisement until late 1995. Meanwhile, Ms. Cox decided to allow the children to live in Indiana with their father.

In late 1995, the attorney for Joel Harney sent Respondent a letter concerning settlement of issues relating to child custody, but did not receive a reply. Thereafter, Harney filed by counsel an emergency petition for change of custody. The trial judge declared an emergency, granted an immediate change of custody, and set the matter for hearing on March 4, 1996.

Ms. Cox was in communication with Respondent about the pending custody matter but she was not advised by him that a hearing was set for March. Telephone records indicate she telephoned Respondent's law office on February 26, March 4, and March 5, 1996.

On March 4, 1996, Respondent falsely advised Harney's attorney that he had not heard from Ms. Cox. He also stated he planned to withdraw from the case. That same date, Harney's attorney appeared in court for the hearing and Respondent did not appear. The trial judge continued the case to May 15, 1996, because he ascertained that Ms. Cox had not been served in Idaho. The judge was told either by Harney's attorney or by court staff that Respondent planned to withdraw.

Ms. Cox received notice from Joel Harney of the May 15, 1996 hearing. Ms. Cox then contacted Respondent and discussed the child custody petition with him. She stated she would not fight for custody but that she did want visitation. She had an interest in the outcome and wanted her children to know she was interested. Respondent told her he would be present at the hearing on the matter. He advised that perhaps she would obtain the same visitation schedule then enjoyed by her former husband, and that she did not need to travel to Indiana for a hearing on these issues.

On the day before the scheduled hearing, Respondent's secretary telephoned the office of Harney's attorney and stated that they

had not heard from Ms. Cox and that Respondent again planned to withdraw from the case. On May 15, 1996, Joel Harney appeared with his attorney before the trial court at the scheduled hearing but Respondent did not appear on behalf of Ms. Cox. The judge determined that Ms. Cox had notice of the hearing, so the hearing proceeded on its merits.

The trial court granted Joel Harney's petition for custody, set a support obligation against Ms. Cox, and granted her supervised visitation in Indiana. On that same day, Respondent filed a motion to withdraw his appearance in the case. In the motion, Respondent stated that he had "not received any communication from [Ms. Cox] for over three months." Assuming the representation to be true, the trial court granted the motion to withdraw.

Respondent did not advise Ms. Cox that he planned to withdraw, nor that he did in fact withdraw, nor what the outcome of the May hearing had been.

Joel Harney advised his attorney on May 29, 1996, that Ms. Cox had telephoned her children and that she did not know about the custody order. Ms. Cox obtained some information from her parents about the outcome of the May hearing, including that she had not had representation. Subsequently, Ms. Cox inquired of Respondent whether he had withdrawn from her case. Respondent lied, telling her he had not withdrawn.

Respondent and Ms. Cox's father, Richard Courtney, first met when Ms. Cox and Respondent were in high school together. They were also acquainted through community and church activities. Courtney called Respondent and asked him why he "had resigned and left [Ms. Cox] unprotected at that hearing." Respondent again lied, replying that he had not withdrawn and that he would check into it and call back, but he never did so.

Respondent was in contact with his client but falsely told opposing counsel and the tribunal that he had not heard from her. His client expected him to represent her interests at the May, 1996 hearing and he neglected those interests and did not appear on her

behalf. Respondent did not tell his client he would not appear, did not tell her he planned to withdraw, and subsequently falsely told her and her father that he had not withdrawn.

#### 2. Cause 361—Count Seven— Conclusions of Law

The facts found with regard to Count Seven in Cause Number 18S00–9706–JD–361 demonstrate that Respondent violated Rule of Professional Conduct 3.3(a)(1), which generally prohibits a lawyer from knowingly making a false statement of material fact or law to a tribunal; Rule 4.1, which generally prohibits a lawyer from making a false statement of material fact or law to a third person in the course of representing a client; and Rule 8.4(c), which generally provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

Respondent also violated the following Rules of Professional Conduct: Rule 1.1, which generally requires lawyers to provide competent representation to clients; Rule 1.3, which generally requires lawyers to act with reasonable diligence and promptness in representing a client; Rule 1.4, which generally requires lawyers to keep a client reasonably informed about the status of a matter, to promptly comply with reasonable requests for information, and to explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation; Rule 1.16(d), which generally requires lawyers, upon termination of representation, to take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client and allowing time for employment of other counsel; and Rule 8.4(d), which generally provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

#### III. Cause Number 18S00–9709– JD–482 ("Cause 482")

#### A. Cause 482—Background

On May 16, 1996, pursuant to Trial Rule 63(B) and its inherent authority, this Court

appointed Respondent as a full-time judge *pro tempore* of Delaware Superior Court 4, effective May 16, 1996, until further order of the Court. The appointment was occasioned by the illness of the sitting judge of that court, the Honorable Robert E. Robinson. As mentioned above, prior to the appointment Respondent had served in that court as its master commissioner. The order of appointment stated:

> This Order shall be sufficient authority for the Honorable Joseph G. Edwards to carry out the regular duties of the Judge of the Delaware Superior Court No. 4, to continue the employment of court personnel, and to be compensated for his period of service as Judge Pro Tempore appointed by this Court pursuant to Indiana Rule of Trial Procedure 63(D).

Trial Rule 63(D) provides in pertinent part that, "A judge *pro tempore* appointed by the Supreme Court under this rule shall receive a salary computed at the same rate as the regular judge commencing from the date he qualifies."

Respondent's appointment as full-time judge *pro tempore* of Delaware Superior Court 4 lasted until November 15, 1996. By that time, Judge Robinson had recovered from his illness and this Court entered an order ending Respondent's appointment as the judge *pro tempore.*

The charges against Respondent in Cause Number 18S00–9709–JD–482 are, in summary, that he continued to practice law and serve as a Henry County probate commissioner during the six month time period he was to be serving full-time as judge *pro tempore* of Delaware Superior Court 4, in violation of various rules of professional and judicial responsibility.

### B. Cause 482—Count One— Factual Findings

Upon being appointed as judge *pro tempore* of the Delaware Superior Court 4, on May 16, 1996, Respondent received pay for his service in that position at the statutory rate of pay for a full-time judge in the State of Indiana pursuant to Indiana Code § 33–13–12–7. Respondent continued to be paid as a full-time judge until his appointment

ended on November 15, 1996. At or shortly following the date of his appointment, Respondent was well aware of the fact that he was being compensated as a full-time judge.

Before the appointment, as mentioned above, Respondent also served as part-time probate commissioner in the Henry Circuit Court, a service for which he was also paid. Respondent's regular hours of service as probate commissioner in the Henry Circuit Court were Tuesdays from approximately 8:00 or 9:00 a.m. until 12:00 noon; Thursdays from approximately 12:30 p.m. until 4:00 p.m.; and Fridays from approximately 1:00 p.m. until 4:00 p.m.

Even after the appointment as full-time judge *pro tempore* of Delaware Superior Court 4, Respondent continued to serve and be paid as part-time probate commissioner in the Henry Circuit Court until on or about October 4, 1996. Thus, on Tuesday mornings and on Thursday and Friday afternoons between May 16 and October 4, 1996, he was not present in or attending to the business of the Delaware Superior Court 4, notwithstanding his appointment as full-time judge *pro tempore* of that court.

By simultaneously being employed as full-time judge in the Delaware Superior Court and as part-time probate commissioner for the Henry Circuit Court, Respondent was engaged in incompatible simultaneous employment. Respondent's full-time judge *pro tempore* responsibilities required that he devote his full professional efforts to the duties and responsibilities of the court he was appointed to serve on a full-time basis.

### C. Cause 482—Count Two— Factual Findings

Before being appointed as judge *pro tempore* of Delaware Superior Court 4 on May 16, 1996, Respondent served and was paid as a part-time Deputy City Attorney for the City of Muncie, Indiana. Even after the appointment, Respondent continued to serve and received his full pay as part-time Deputy City Attorney until on or about October 4, 1996.

Respondent's job responsibilities as Deputy City Attorney changed somewhat after the

primary election in March of 1996, because his opponent in the fall 1996 general election for judge of Delaware Superior Court 4 was the judge of the Muncie City Court, a court in which Respondent routinely handled cases for the City of Muncie. Respondent felt it was in the best interests of the City that he not appear on the city's behalf in Muncie City Court until after the general election in the fall of 1996.

Respondent nevertheless continued to process and file pleadings on behalf of the City in the Muncie City Court but made arrangements with another Deputy City Attorney to take those matters into court. In return, Respondent assumed responsibility from another Deputy City Attorney for at least two other City of Muncie legal matters.

Pay records of the City of Muncie reflect that during the time period Respondent was a full-time judge *pro tempore* in Delaware Superior Court 4, he continued to practice law, receiving gross wages in the amount of $5,247.18 from the City of Muncie for services as part-time Deputy City Attorney.

### D. Cause 482—Count Three— Factual Findings

Before being appointed as judge *pro tempore* of the Delaware Superior Court 4, Respondent maintained a law office in Muncie from which he engaged in the private practice of law. Even after the appointment, Respondent continued to engage in the private practice of law.

Respondent's records from his private law office reflect that from May 16, 1996 through November 15, 1996—the time in which Respondent was employed as a full-time judge—he logged 303.0 hours of time in his private law practice. Not included in this time is the number of private practice hours that may have been logged on fourteen dates for which pages were missing from his office calendar. The Commission subpoenaed Respondent's calendar records showing his private law practice activity during this period of time. Respondent did not produce the calendar pages for the missing fourteen days.

We infer from the fact that those calendar pages were under Respondent's control that the missing calendar pages document additional activities in his private law practice, consistent with the pattern of activity reflected in the calendar pages that were produced.

Even after his appointment as judge *pro tempore* on May 16, 1996, Respondent continued to take new cases in his private practice of law. Respondent claimed at trial that he curtailed his private practice activities on or about October 1 or 2, 1996. However, ten of the fourteen missing calendar pages are on the dates following October 2, 1996.

The time entries on Respondent's calendar reflect that he attended court hearings (including hearings in other courts in Delaware County), mediation sessions, and meetings with clients during normal business hours when he should have been attending to the business of the Delaware Superior Court 4.

Respondent continued an active private law practice while simultaneously serving as a full-time judge *pro tempore* in Delaware Superior Court 4.

### E. Findings With Regard to Respondent's Defenses in Cause 482

■■■ Respondent's defense in this cause has principally been that the Commission should be estopped from prosecuting the charges. Respondent asserts, in general, that he consulted with counsel to the Commission, Margaret Babcock, and that she "reassured him that he could handle all these responsibilities" and that his conduct would be "condoned."[5] Review Brief at 9–10.

■■■ A threshold question arising in this cause is whether estoppel is ever available to preclude the prosecution of a disciplinary case. As a general principal, estoppel is an equitable doctrine whereby one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct. Black's Law Dictionary 494 (5th ed. 1979). For ex-

---

5. The reason the charges in Cause 482 were filed and prosecuted under a different cause number from the other charges against Respondent was

to accommodate the fact that Ms. Babcock was required to appear as a witness in connection with this cause.

ample, we have held that a city was estopped from arguing that an agreement was not binding upon it in light of language within the agreement itself stating that the agreement had been reviewed by counsel for the city and found to be proper in all respects. *Speckman v. City of Indianapolis,* 540 N.E.2d 1189, 1191 (Ind.1989).

Respondent argues that he consulted with the Commission's counsel and was given permission to serve as a full-time judge *pro tempore,* a part-time probate judge, and continue to practice law. Thus, he claims the Commission should be estopped from now asserting that his conduct was in violation of the ethical obligations of lawyers and judges.

On the one hand, where a judge honestly seeks advice from the Commission's counsel about a particular ethical problem and reasonably relies on it, there might be good reason to foreclose prosecution if that advice turned out to be wrong. On the other hand, judges are individually responsible for making sure that their conduct comports with the Code of Judicial Conduct.

However, in this instance, we need not address the legal question of whether estoppel could ever apply in a disciplinary proceeding. Even assuming that the Commission could, in the proper case, be equitably estopped from prosecuting charges, there is simply no factual basis for applying that doctrine in this cause.

As noted above, Respondent was appointed as full-time judge *pro tempore* of Delaware Superior Court 4 on May 16, 1996. Respondent claims he spoke by telephone with Ms. Babcock on or about May 22, 1996, and discussed with her the classification of his position in light of the terminology section of the Code of Judicial Conduct. Respondent did not create or maintain any contemporaneous notes of his conversation with Ms. Babcock. He admits that he does not specifically recall asking Ms. Babcock to provide advice concerning the implications of his judicial classification on his continuing employment as part-time probate commissioner in the Henry Circuit Court. He also does not recall discussing with Ms. Babcock the implications of his judicial classification on his private law practice.

Following that telephone conversation, Respondent asserts he prepared a letter to Ms. Babcock on that same day. The sum and substance of that letter was to confirm a conversation in which it was established that Respondent had been appointed judge *pro tempore* in Delaware Superior Court 4 and that he was supposedly classified as a continuing part-time judge as defined by the Code of Judicial Conduct.

Ms. Babcock does not have an independent recollection of receiving the May 22, 1996 letter from Respondent and a diligent search of her records has not uncovered a file copy of the letter. Respondent's alleged letter is the type of correspondence that Ms. Babcock would routinely maintain in her permanent file system. Support staff witnesses were not able to testify with certainty that the letter had been sent.

However, even if Ms. Babcock actually received the May 22, 1996 letter around the time it was purportedly sent, it would not have had any significance to her other than as confirmation of an understanding that Respondent was a part-time judge. This would not have been noteworthy information to Ms. Babcock, since she already knew Respondent as a part-time judge by virtue of his employment as master commissioner in Delaware Superior Court 4 and probate commissioner in the Henry Circuit Court. The letter—even if sent and received—simply did not put her on notice that Respondent's appointment as judge *pro tempore* was a full-time appointment.

Ms. Babcock recalls in general terms having a telephone conversation with Respondent about the limitations on other employment applicable to continuing part-time judges. However, at that time, Ms. Babcock was not aware that he had been appointed as full-time judge *pro tempore* in Delaware Superior Court 4.

Had Ms. Babcock been informed that Respondent was a full-time judge, not a part-time judge, her advice to him in May of 1996 would have been that a full-time judge cannot practice law and that he could not be simultaneously employed as part-time commissioner in another court. In fact, Ms.

Babcock had been previously asked to give an opinion on similar issues when Deborah Smith, a juvenile referee in Boone County, was appointed to serve as full-time judge *pro tempore* in the Boone Circuit Court. The advice Ms. Babcock gave to Deborah Smith was that she was required to resign as juvenile referee, that she could neither go to court as an attorney on behalf of private clients nor file papers and pleadings in any court on behalf of private clients, and that she should wind down her private practice.

Respondent made no further attempt to contact the Commission. Ms. Babcock first became aware that Respondent had been appointed full-time judge *pro tempore* when, on October 1 or 2, 1996, she was notified by his opponent in the fall general election that he was the full-time judge *pro tempore* of Delaware Superior Court 4, and that he simultaneously held another judicial appointment and was practicing law.

On October 1 or 2, 1996, Ms. Babcock contacted Respondent to confirm and discuss his multiple employments. After confirming that Respondent's appointment as judge *pro tempore* was full-time, Babcock informed him that it was improper for him to maintain his employment as probate commissioner in the Henry Circuit Court and to maintain a private law practice that called upon him to file papers and appear in court on behalf of clients. Ms. Babcock indicated to Respondent that his ability to maintain multiple legal or judicial employments had nothing to do with the rules affecting continuing part-time judges because he was a full-time judge.

To the extent Ms. Babcock gave advice to Respondent it was without knowledge on her part that he was at that time employed on a full-time basis as judge *pro tempore* in Delaware Superior Court 4. Furthermore, at no time did Ms. Babcock advise Respondent that it was proper for him to be simultaneously employed as full-time judge *pro tempore*, as part-time probate commissioner, and as a private law practitioner. Therefore, there is no basis for Respondent's defense to this cause that he was relying upon advice from the Commission or its counsel.

By way of further defense to the charges of working as both a full-time judge in one court and part-time judge in another, Respondent also claimed at trial that he was able to conduct the business of Delaware Superior Court 4 by working less than full-time. He claimed his work as a probate commissioner in another court did not affect the performance of his judicial duties in Delaware Superior Court 4. Further, asserts Respondent, the other work as probate commissioner in Henry County was judicial in nature and should therefore not be considered improper. Both assertions are incorrect. The record introduced at trial shows that there was more judicial work that should have been done during Respondent's tenure as judge *pro tempore* in Delaware Superior Court 4. While Respondent was engaging in other activities at another court, that work was not being done and Delaware Superior Court 4 suffered for it. Most importantly, however, as a full-time judge in Delaware County, Respondent was simply not free to absent himself from his court to engage in other lucrative judicial employment in another county on a regular basis.

*F. Cause 482—Conclusions of Law*

■ The facts found with regard to Counts One, Two, and Three in Cause Number 18S00–9709–JD–482 demonstrate that Respondent violated Canon 4(G) of the Code of Judicial Conduct, which provides generally that a judge shall not practice law and Canon 3(A), which generally requires that a judge's judicial duties take precedence over all other activities.

Respondent also violated the Canon 1 of the Code of Judicial Conduct, which generally requires judges to uphold the integrity and independence of the judiciary and Canon 2(A), which generally requires judges to avoid impropriety and the appearance of impropriety and to act at all times in a manner promoting public confidence in the integrity and impartiality of the judiciary. In addition, Respondent committed willful misconduct in office and engaged in conduct prejudicial to the administration of justice, which are grounds for discipline of a judge pursuant to Admission and Discipline Rule 25(III)(A). Further, Respondent violated Rule 8.4(d) of the Rules of Professional Con-

duct, which provides generally that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

## IV.  Sanctions

The Masters appointed to hear the evidence and report their findings to the Court in these causes made recommendations with regard to sanctions that should be imposed upon Respondent for his numerous violations of the ethical codes that govern the conduct of judges and lawyers.  The Masters' recommendations were to permanently remove him from the office of Judge of Delaware Superior Court 4;  to issue a permanent injunction against him prohibiting him from ever seeking election or appointment to or holding any type of judicial office;  to permanently disbar him or suspend him from the practice of law for at least five years;  to fine him $100,-000.00 suspended upon the condition that he pay reimbursement to the State of Indiana for all judicial salary he received during his suspension from the bench with pay;  and to require him to pay the costs and expenses incurred in the proceedings in these cases. The Court is not limited by the recommendation of the Masters as to the sanction to be imposed in any case.  Admis.Disc.R. 25(VIII)(N)(2).  The Commission, with the Chief Justice of Indiana not participating, has urged the Court to adopt the Masters' recommendations.

After the trial was concluded and the Masters had submitted their findings and conclusions to the Court, and after Respondent had filed petitions for review challenging those findings, Respondent then tendered to the Court an affidavit admitting to the charges and purporting to resign from the bar of Indiana attorneys.

■ The applicable Rule provides that "upon receipt of the required affidavit, this Court shall enter an order approving the resignation or imposing a disciplinary sanction on consent."  Admis.Disc.R. 23(17)(b). However, Respondent's attempt at resigning from the bar comes too late.  In order to qualify under the Rule, one of the statements that must be made under oath in the affidavit of resignation is:

The respondent submits his or her resignation or consent because the respondent knows that if charges were predicated upon the matters under investigation, or if the proceeding were prosecuted, he or she could not successfully defend himself or herself.

Admis.Disc.R. 23(17)(a)(4).  In this instance, the proceedings against Respondent had, in principal part, *already been* prosecuted by the time he attempted to tender his resignation from the bar.  During that prosecution, Respondent repeatedly denied the charges against him.  The admission of wrong-doing came only after the charges against him had already been proven by clear and convincing evidence to the satisfaction of the three Masters initially responsible for fact-finding. It would be inconsistent with the intent and language of the Rule for Respondent to be allowed to simply resign under these circumstances.  As further evidence of the incongruity of the situation, the Court has simultaneously pending before it Respondent's petitions for review in which he denies the charges against him, and a tender of resignation in which he admits the charges against him.

■ When an attorney waits until disciplinary fact-finding has already been concluded and initial findings and conclusions made, we may but are not compelled to accept an affidavit of resignation.  For the reasons cited above, we decline to accept the tendered resignation of Respondent and instead impose our own sanctions for Respondent's many and serious violations of the ethical rules governing judges and lawyers.

■ In summary, Respondent committed the unconscionable act of using his law license as a means to barter for sex.  He flagrantly breached the trust placed in him as a judge and as an attorney by creating a fraudulent court decree purporting to dissolve a marriage and provide for child custody.  He attempted to pass the fraudulent decree off to his client as an authentic adjudication of her legal status and legal rights. When legitimate inquiries arose concerning the document, he lied to other judges, to court staff, and to his client.  These false-

hoods were part of a pattern of making misleading or outright false statements to clients and to anyone else who questioned his conduct. He presided over a case involving a person with whom he was having a sexual relationship. While employed and paid as a full-time judge *pro tempore* in one court, Respondent continued to work and collect a salary for part-time judging in another court. Respondent engaged in the private practice of law while serving as a full-time judge.

In short, Respondent engaged in numerous intentional acts of deceit, exploitation, and neglect. He defrauded and cheated the taxpayers of this State and repeatedly betrayed his professional responsibilities both as a judge and as a lawyer.

Further, we find an absence of mitigating circumstances. Respondent flatly denied the charges under oath and, even in the face of overwhelming evidence of wrongdoing, has resisted accepting any responsibility for his unethical conduct. Respondent has shown no expression of remorse nor made any apology to the public or to the individual people whose trust he violated.

Respondent's resignation from the bench became effective on the date it was tendered. The Court further orders as follows. Joseph G. Edwards is permanently enjoined from ever seeking judicial office of any kind in the State of Indiana. He is disbarred from the practice of law and permanently enjoined from seeking reinstatement as a lawyer. We further fine Respondent $100,000 (One Hundred Thousand Dollars). The fine will be suspended if Edwards documents to the satisfaction of the Commission that he has reimbursed the State of Indiana for all judicial salaries he received as part-time probate commissioner in the Henry Circuit Court during the time period he was the full-time judge *pro tempore* of Delaware Superior Court 4 and that he has reimbursed the City of Muncie for any pay received as a part-time Deputy City Attorney during that same time period. Respondent is further assessed with the costs of these actions.

*All Justices concur.*