**In the Matter of the Honorable Douglas B. MORTON, Judge of the Fulton Circuit Court.**

**No. 25S00–0109–JD–435.**

Supreme Court of Indiana.

July 8, 2002.

Martin E. Risacher, Noblesville, IN, Attorney for Respondent Hon. Douglas B. Morton.

Meg W. Babcock, Indianapolis, IN, Attorney for the Commission on Judicial Qualifications.

JUDICIAL DISCIPLINARY ACTION

PER CURIAM.

## INTRODUCTION

This matter comes before the Court as a result of a judicial disciplinary action brought by the Indiana Commission on Judicial Qualifications ("Commission") against the Respondent herein, Douglas B. Morton, Judge of the Fulton Circuit Court. Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give the Indiana Supreme Court original jurisdiction over this matter.

After the Commission filed formal charges but before the matter could be heard by the judges appointed to take evidence in this proceeding, the parties jointly tendered a Statement of Circumstances and Conditional Agreement for Discipline. The parties have stipulated to the following facts.

## FACTS

Respondent was serving as a special judge in a child custody matter that arose in a neighboring county. In 1996, a previous judge had awarded custody of the parties' children to the mother, modifying an earlier custody modification order awarding custody of the children to their father. Prior to the 1996 custody decision, the mother had received counseling from a mental health therapist, and, on a few occasions, she also took the children to counseling sessions with this same therapist.

The mother had filed the motion seeking modification in April 1995. In September 1995, the therapist sent two psychological reports to the court-appointed psychological evaluator of the children, which purported to be reports written by a clinical psychologist. The clinical psychologist was an independent contractor with the therapist and frequently tested her patients. The psychological reports, dated April 1995, contained information and conclusions not supportive of the father's continued custody.

In preparation for the custody hearing, the court-appointed child custody evaluator conducted his own evaluations of the children and obtained substantial information from various sources about the appropriateness of both parents as custodial parents. He prepared a report for the court. In his report, he outlined all the information available to him and referred to the contents of the psychological reports. The custody evaluator concluded, "Based on information from interviews with all parties, collateral data reviewed, psychological testing, and home visit information, (the mother) clearly presents a more appropriate custodial parent than does (the father)." Ultimately, as noted above, the previous judge determined that custody should be returned to the mother.

After losing custody of the children, the father filed another motion to modify custody. He requested a change of judge, and Respondent assumed jurisdiction as special judge.

On June 18, 1999, the father filed, by counsel, a Trial Rule 60(B) motion seeking to set aside the previous custody decision. In this motion, the father asserted that the previous judge had awarded custody to the mother as a result of a fraud on the court. The allegation of fraud was based on a claim that the signature of the clinical psychologist had been forged on the psychological reports.

Attached to the motion was an affidavit from the clinical psychologist stating that he had no recollection of ever seeing the children, that he did not sign the psychological reports, and that he had not prepared them. Also attached was the affida-

vit of the therapist's secretary stating that she had signed the name of the clinical psychologist to the reports at the direction of the therapist who told the secretary that the clinical psychologist had approved doing so because of time constraints. Father asserted that the therapist had created the reports.

In addition to filing the motion with the clerk of the court and serving opposing counsel, the father's attorneys hand-delivered the motion to Respondent. When they presented Respondent with a copy of the motion, the three engaged in an *ex parte* conversation.

One of the father's attorneys told Respondent that he thought that Respondent would find the motion "very interesting reading," and that it included information that established a "lay down" case of forgery against the therapist. This same attorney urged Respondent to review the motion promptly. He told Respondent that he felt that, pursuant to a protective order relating to documents about the children, he could not refer the alleged forgery to law enforcement himself, but he told the Respondent that he expected Respondent would feel compelled to do so. He also suggested that if Respondent was inclined to refer the case to law enforcement, the attorney was opposed to sending it to a certain named county, and instead preferred another county that he identified. This same attorney also told Respondent that he had concerns for the safety of the woman who had signed the psychologist's name to the psychological reports because he did not trust the therapist.

Respondent contacted a colleague who suggested that Respondent turn the matter over to the State Police for investigation. The Respondent followed this advice. However, when Respondent was unsuccessful in making a referral to the local State Police post, he decided to contact a prosecuting attorney who had previously worked with the State Police. Respondent believed that this prosecutor would be able to advise him of the proper procedure for referral and the identity of the appropriate State Police official to whom the referral should be made.

The prosecuting attorney contacted by Respondent is the brother of the father's local counsel who was present during the *ex parte* communication, although not the attorney who spoke directly with Respondent. The prosecutor subsequently sent a sample letter to Respondent for use in making the State Police referral, gratuitously adding a hand-written note stating, "Good Hunting." At Respondent's request, the prosecuting attorney never advised his brother of this contact.

Thereafter, Respondent forwarded the materials presented to him by the father's lawyers to the State Police. Respondent did not advise either party of the referral to the State Police.

Within a few days after being assigned the matter, the State Police investigator met with Respondent and reviewed the entire file. Respondent declined the invitation by the investigator to be kept informed regarding the progress of the investigation. Thereafter, a county prosecutor authorized an immediate investigation.

The *ex parte* communication occurred on June 18, 1999. On June 29, 1999, Respondent scheduled the hearing on the Trial Rule 60(B) motion for August 17, 1999. On July 7, 1999, the father filed an emergency petition seeking a temporary modification of custody pending the Respondent's decision on the Trial Rule 60(B) motion. The petition alleged no factual basis for the request, nor any emergency grounds.

The referral by Respondent to law enforcement occurred on July 12, 1999. On July 15, Respondent presided over the hearing on the emergency custody issue, during which the father's attorney made references to the alleged crimes by the therapist. Respondent made no disclosure of the *ex parte* communication or the referral to the police at this hearing. Respondent submits that he failed to make any disclosure because he was concerned that his disclosure might jeopardize the investigation and that adequate time for disclosure prior to the hearing still existed.

On July 15, the Respondent granted a motion filed by the father and continued the August 17 hearing, resetting it for August 31. Unknown to Respondent, the State Police investigator interviewed the father's attorneys on July 22, 1999. On August 10, the parties appeared in court on various discovery issues, and Respondent again made no disclosures of the *ex parte* conversation or the referral to the police.

Later that day, one of the mother's attorneys was reviewing what he believed to be the court's official file and discovered a sub-file captioned "(case name) Criminal Investigation," which happened to be Respondent's private file. This file included the sample referral letter with the note to Respondent stating, "Good Hunting," and the correspondence to the State Police.

Thereafter, the mother's attorney filed a motion asking Respondent to disqualify himself. At the hearing on this motion, held on August 23, 1999, Respondent and both of the father's attorneys revealed the nature of the *ex parte* communication. Respondent also explained his referral of the alleged forgeries to the State Police by stating that it was his belief that the information warranted prompt reporting and that he was the only person in a position to

report it. Respondent did not disqualify himself from the case.

The mother then filed, by her counsel, an original action with the Indiana Supreme Court requesting a writ of mandamus requiring Respondent to disqualify himself. The issues regarding the conversation between the father's lawyers and Respondent and the details of the criminal referral were fully briefed. Respondent declined to file any response to the writ application. Ultimately, this Court issued an order stating:

> The Court has now reviewed the materials of record, and met in conference to discuss the case. The original action is an extraordinary remedy, which is viewed with disfavor, and may not be used as a substitute for appeal. Original Action Rule 2(E). Writs of mandamus will be issued only where the trial court has an absolute duty to act or refrain from acting. *State ex rel. Pickard v. Superior Court of Marion County,* 447 N.E.2d 584 (1983). In this instance, the Court cannot say with certainty that relator has met this standard. On that narrow basis, the Court DENIES the writ.

Respondent believed that the Court's ruling meant that no adequate showing of an appearance of impropriety had been made and that he had not violated the Code of Judicial Conduct by refusing to disqualify himself.

By the time the hearing on the father's motion to set aside the custody decision occurred in January 2000, the prosecutor investigating the allegations against the therapist wrote to Respondent and stated, "I am writing to advise you formally of the outcome of the criminal investigation, which arose from the report you made to the Indiana State Police regarding [the child custody case]. Given the assertions made in the affidavits filed in the [child

custody] case, I think this matter certainly needed to be investigated. However, as often proves to be the case, the recollections of the various witnesses did not turn out to be solid and reliable as the affidavits suggested."

Before evidence was presented at the hearing on the father's motion to set aside the prior custody decision, Respondent denied the therapist's motion to intervene in the proceeding. Thereafter, the father presented his case, focusing in large part on the psychological reports alleged to have been forged by the therapist. The clinical psychologist, who had stated in his affidavit that he had no recollection of ever seeing the children, acknowledged at the hearing that his handwriting was on certain testing documents relating to the children, but he insisted he had not created the psychological reports. The therapist testified and denied the forgery.

After three and half days of evidence, Respondent advised the parties that his inclination was to rule against the father's motion to set aside the custody order, having concluded that the father failed to prove that the custody modification order was obtained by fraud, in part because the custody evaluator did not rely upon the psychological reports in recommending that custody go to the mother, and also because the evidence did not establish that the mother was involved in the alleged scheme to defraud the prior court. However, in rendering his decision, Respondent stated that the father had established that the psychological reports were forged and that the therapist was the "leading candidate" in a forgery.

Respondent stated further that he had "high hopes" the criminal investigation would remain active, which statement he submits was made because he believed that the continued investigation of the therapist's psychological reports had sig-

nificance to the judiciary with respect to the trustworthiness of child custody evaluations. Respondent now understands that his comments further undermined the public faith in his impartiality as well as the faith of those with interests at stake in the custody case.

## CONCLUSION

The parties agree, as does this Court, that Respondent violated Canon 3(B)(8) of the Code of Judicial Conduct by engaging in a conversation with the father's attorneys, which included commentary on the strength of the motion, insinuations that the therapist was a threat to a witness, and an expressed desire that the Respondent initiate a criminal investigation of the therapist.

The parties and Court also agree that Respondent violated Canon 3(B)(8) by failing to promptly report the *ex parte* communication.

Finally, the parties and Court agree that Respondent should have disqualified himself because of the *ex parte* contact, the criminal investigation he initiated, and the failure to disclose those facts. Judicial Canon 3(E)(1) requires a judge to disqualify if the judge's impartiality might reasonably be questioned. The standard is not whether the judge personally believes himself or herself to be impartial, but whether a reasonable person aware of all the circumstances would question the judge's impartiality. *In re Edwards*, 694 N.E.2d 701, 710 (Ind.1998). One purpose of disqualification is to preserve the parties' and the public's faith in the fairness of the system, even when the judge asserts he has no personal bias.

In this case, the combination of all of the facts indicate that a reasonable person would have doubted Respondent's impartiality after his failure to disclose the *ex*

*parte* communication and the referral to the State Police, and after the mother's attorney discovered the sample letter with the "Good Hunting" note. These facts, coupled with Respondent's later comments on the record about his continuing suspicions of the therapist after the determination by the prosecuting attorney not to file criminal charges, gave the appearance of partiality. The complaint against Respondent might have been avoided by prompt disclosure of the *ex parte* communication and the criminal referral.

In mitigation, Respondent states, in effect, that he sincerely but mistakenly believed that his conduct was appropriate to the situation. The parties also ask the Court to recognize Respondent's long and exemplary judicial service to the citizens of the State.

The parties have further agreed, as does the Court, that the appropriate sanction for this misconduct is a public reprimand. Accordingly, Douglas B. Morton, Judge of the Fulton Circuit Court, is hereby reprimanded. This discipline terminates the disciplinary proceedings relating to the circumstances of this cause. The costs of this proceeding are assessed against Respondent.

All Justices concur.