**In the Matter of Elizabeth Bashaw BYBEE, Candidate for Judge of Madison County Court 2.**

No. 48S00–9607–JD–480.

Supreme Court of Indiana.

Oct. 5, 1999.

Kevin McGoff, Indianapolis, Indiana, Attorney for Respondent.

Margaret W. Babcock, Indianapolis, Indiana, Attorney for Commission.

JUDICIAL DISCIPLINARY ACTION

PER CURIAM.

This matter comes before the Court as the result of a judicial disciplinary action brought by the Indiana Commission on Judicial Qualifications against the Respondent, attorney Elizabeth Bashaw Bybee. Respondent is not a judge in the State of Indiana. However, the charges relate to Respondent's conduct during her candidacy for the office of Madison County Court judge. This Court has jurisdiction pursuant to art. VII, § 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25.

The Commission filed its Notice of the Institution of Formal Proceedings and Statement of Charges on July 9, 1996. Thereafter, this Court entered an order appointing three trial judges to serve as Masters in this proceeding. The Masters' role is to hear the evidence and to report their findings and conclusions to the Court. Admis. Disc. R. 25(VIII)(I). A hearing was held and evidence was presented by both sides.

In due course, the Masters submitted their findings and conclusions. Two of the Masters concluded that Respondent committed violations of the Code of Judicial Conduct. The remaining Master dissented, finding that the Commission failed to prove a violation by the clear and convincing evidentiary standard applicable to this type of proceeding. Admis. Disc. R. 25(VIII)(L)(1). The Commission filed its recommendations and Respondent filed a petition for review with an accompanying brief in support.

The majority of the Masters concluded that Respondent made knowing misrepresentations about the incumbent judge's judicial record during the course of her candidacy for office. In so doing, the Masters found that Respondent violated Canon 5(A)(3)(d)(iii) of the Code of Judicial Conduct. That provision states that a candidate for a judicial office shall not knowing-

ly misrepresent the identity, qualifications, present position or other fact concerning the candidate or an opponent. The majority of the Masters also found that Respondent's conduct violated Canon 5(A)(3)(a), which provides generally that a candidate for judicial office shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary.

The majority of Masters recommended that Respondent be privately reprimanded for her conduct. In briefs submitted to the Court following the report by the Masters, Respondent argues that the Commission failed to prove any violation of the Rules of Judicial Conduct. The Commission asserts that the majority of the Masters correctly determined that a violation occurred, and recommends that Respondent be publicly reprimanded.

■ The rules governing our review provide that the recommended findings of fact and conclusions of law of the Masters are not binding upon the Supreme Court. Admis. Disc. R. 25(VIII)(N)(1). Our review of the Masters' report is *de novo. In re Drury*, 602 N.E.2d 1000, 1002 (Ind. 1992). In this case, however, we adopt in whole the findings of fact and conclusions of law of the majority of the Masters. We will separately address the appropriate sanction.

I

Bybee stands accused of violating the third clause of the following provision of the Indiana Code of Judicial Conduct:

A candidate, including an incumbent judge, for judicial office ... shall not:

(i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office;

(ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; or

(iii) knowingly misrepresent the identity, qualifications, present position or other fact concerning the candidate or an opponent.

Ind. Judicial Conduct Canon 5(A)(3)(d).[1]

Mindful of the cherished place free and unfettered campaign speech holds in our constitutional order, we have nevertheless promulgated this rule because of the difference between campaigns for judicial office and those for legislative and executive offices. This difference is fundamental and profound. For while officeholders in all three branches serve their constituents as voters, judges serve their constituents in another, equally important way: as litigants and potential litigants. *See* Randall T. Shepard, *Campaign Speech: Restraint and Liberty in Judicial Ethics*, 9 Geo. J. Legal Ethics 1059, 1075 (1996).

As litigants and potential litigants, a judge's constituents are entitled to due process of law before they may be deprived of life, liberty or property, U.S. Const. amends. 5 & 14; and, in Indiana, to remedy by due course of law for injury done to them in their person, property or reputation, Ind. Const. art. I, § 12. Vot-

1. The Official Commentary to this provision reads as follows:

Section 5A(3)(d) prohibits a candidate for judicial office from making statements that appear to commit the candidate regarding cases, controversies or issues likely to come before the court. As a corollary, a candidate should emphasize in any public statement the candidate's duty to uphold the law regardless of his or her personal views. See also Section 3B(10), the general rule on public comment by judges. Section

5A(3)(d) does not prohibit a candidate from making pledges or promises respecting improvements in court administration. Nor does this Section prohibit an incumbent judge from making private statements to other judges or court personnel in the performance of judicial duties. This Section applies to any statement made in the process of securing judicial office, such as statements to commissions charged with judicial selection and tenure and legislative bodies confirming appointment.

ers elect mayors, city councilmen, governors, state legislators, presidents and members of congress to pursue certain public policies. But voters elect judges to "listen and rule impartially on the issues brought before the bench." Shepard, *supra,* at 1077.

We firmly believe that the ability of judges to provide litigants due process and due course of law is directly and unavoidably affected by the way in which candidates campaign for judicial office. This can happen in several ways. First, a candidate for judicial office who makes certain promises in a campaign may feel an obligation to fulfill those promises once elected. *See In re Haan,* 676 N.E.2d 740, 741 (Ind.1997) (Candidate for judge promised if elected to "stop suspending sentences" and to "stop putting criminals on probation."). As a corollary, a candidate for judicial office attacked in an election may feel pressure to vindicate those attacks once elected. Second, an incumbent judge who will need to promote or defend his or her record in the next campaign may feel pressure to make decisions that will make good or pre-empt bad campaign copy. *See Buckley v. Illinois Judicial Inquiry Bd.,* 997 F.2d 224 (7th Cir.1993) (Illinois appellate judge's campaign literature emphasized that he had never reversed a rape conviction.). Third, even though most—and perhaps almost all—judges will be able to resist the pressures just described, the litigants who come before them may well believe that the judges will act in a way consistent with their campaign behavior rather than consistent with due process and due course of law. *Stretton v. Disciplinary Bd. of the Supreme Court of Pa.,* 944 F.2d 137, 144 (3d Cir.1991).

We recognize that some courts have barred disciplinary action against judges for campaign promises and statements on First Amendment grounds. *See, e.g., Buckley,* 997 F.2d at 224. But we

believe that these decisions failed to recognize fully the seriousness of the countervailing constitutional threat posed by permitting candidates wide latitude in waging campaigns for judgeships. While the resolution of this case does not require us to balance the judicial candidate's First Amendment campaign speech rights against the due process and due course of law interests in regulating judicial campaign speech, we believe that the latter interests are compelling and that our rule is narrowly tailored to suit those interests. *See Republican Party of Minn. v. Kelly,* 63 F.Supp.2d 967 (D.Minn.1999); *Stretton,* 944 F.2d at 142.

## II

Although our review is *de novo,* in this case we adopt in whole the findings of fact as found by a majority of the Masters.[2] A summary of those facts follows.

Respondent was admitted to practice law in Indiana on January 20, 1984. Since that date, she has been a member in good standing of the Indiana Bar. The charges filed against Respondent relate to Respondent's candidacy for judge of Madison County Court 2, having filed her notice of candidacy on January 21, 1996. The Honorable Thomas C. Clem was the incumbent judge of Madison County Court 2 and was a candidate for re-election to the office.

In late January, 1996, Respondent wrote and distributed or caused to be distributed a campaign brochure in support of her candidacy. Certain assertions made in that brochure form the basis for the Commission's charges against Respondent. Specifically, Respondent or her agents prepared a campaign brochure that stated:

Litigants in County Court 2 have complained of cases held "under advisement" for *months* at a time.

**2.** The Court also wishes to thank the Masters for their service and diligence in presiding over this case.

The number of pending cases in County Court 2 has more than doubled under the current judge. Hundreds of people are *still* waiting to have their disputes resolved.[3]

One initial source of information for the brochure was a telephone conversation with attorney Larry Van Briggle. During that call, Bybee learned that one of Van Briggle's clients had been upset because it took a long time to resolve his case. The Chronological Case Summary ("CCS") in the cause indicated that the cause was filed on August 24, 1994 and shortly afterward, the defendant filed its answer. The matter was set for trial on December 2, 1994, but Van Briggle entered his appearance on behalf of the defendant on December 1 and requested a continuance. The matter was reset for trial on March 9, 1995. No entry was made on the CCS on March 9. However, Bybee somehow obtained the handwritten trial notes of Judge Clem, indicating that the matter had been tried on March 9, 1995.

Not of record in the cause, and not available to Respondent, was the fact that at the conclusion of the trial, the attorney for the plaintiff informally requested additional time to submit a brief, and Van Briggle indicated that he wanted to review the brief to see if he would be filing a response. On April 6, 1995, the plaintiff's attorney informally requested an additional thirty days. On May 4, the plaintiff's attorney again requested an additional fifteen days and suggested that if he had not filed a brief at the end of that time period, the judge should rule. Judgment favoring the defendant was entered on May 29, 1995, eighty-one days following trial.

The second initial source of information was Respondent's husband. He told Respondent about comments he had heard regarding a worker's compensation case.

Respondent later learned the name was *King v. Maines*. Respondent obtained a copy of the CCS in that cause and noted that the last entry was made on April 17, 1995. The entry stated: "Notice of Filing in Support of Defendant's Motion to Dismiss filed by Charles Braddock." At no time prior to that entry had a motion to dismiss been filed and it was not until March 4, 1996 (after the brochure had been printed) that a motion to dismiss was actually filed. Respondent did not talk directly to the parties or to the attorneys involved, nor was a specific complaint addressed to her.

Respondent also relied upon court statistical reports. The 1995 quarterly reports in Respondent's possession provided her with information on the number of filings in each quarter, the number and types of dispositions, the number of cases pending at the beginning and the end of the quarter, and the number of cases under advisement. At the end of each of the ten quarters from July 1994 to the end of 1995, County Court 2 had, respectively, 3,0,1,2,1,0,1,2,1, and 0 cases under advisement. Respondent was able to distinguish the difference between "pending cases" and cases "under advisement."

Respondent also used the annual reports from 1991 through 1995 to determine the number of pending cases in both County Courts 1 and 2. The statistics indicate there were 1176 cases pending in County Court 2 at the time Judge Clem was elected to the bench in 1990. Over the following years, with the exception of 1995, the number of dispositions remained relatively steady while the number of filings increased slightly.[4]

After preparing a draft of the brochure, Respondent consulted two experienced Madison County Judges to elicit their opinions as to the brochure prior to its

---

3. Each emphasis in original.

4. In 1991, there were 3118 filings and 2797 dispositions in County Court 2; in 1992 there were 2909 filings and 2746 dispositions; in 1993 there were 2745 filings and 2757 dispositions; in 1994 there were 3041 filings and 2763 dispositions; in 1995 there were 3320 filings and 2498 dispositions.

publication: the Honorable Thomas Newman, Jr., Judge of the Madison Superior Court and the Honorable Dennis D. Carroll, Judge of the Madison Superior Court. Both of the judges described judicial campaigns in Madison County as aggressive and seriously contested. Campaign literature was described as being similar to the aggressive style of other offices such as commissioner or state legislator.

Judge Newman advised Respondent that if her facts were supportable and she could back up her statements, then she should be able legitimately to publish the brochure.

Judge Carroll advised Respondent that she should be certain her facts were relevant to her opponent's service as judge. In addition, he understood from "scuttlebutt" around the courthouse that cases moved slowly in County Court 2 and was not concerned or alarmed regarding the proposed language.

In late February, 1996, the brochure was mailed by Respondent or her agents to approximately 278 households. Approximately 300 brochures were distributed at an annual Lincoln Day Dinner. Twenty others were mailed to a relative of Respondent for him to distribute.

In early March, Respondent received a telephone call from the Commission regarding the brochure and the basis for the statements contained in it. Although reluctant to do so, on March 8, 1996, Respondent provided the Commission copies of the two CCSs on which she had relied for her statements. On March 15, 1996, she provided the Commission with copies of a redrafted brochure. All remaining copies of the original brochure were destroyed.

Respondent did not inquire into the status of any of the pending cases in County Court 2 to support her claim that hundreds were still waiting. The number of cases filed in 1995 was so disproportionate to prior years, causing a significant increase in the number of pending cases, that additional research was warranted before reaching any conclusions about the data.

Respondent knew that County Court 2 was not reporting cases under advisement in numbers approaching the hundreds.

Respondent compared the statistics in County Court 2 with those in County Court 1 and had used that comparison, in part, to justify her claims about Judge Clem. However, given the differences in types of cases heard by the two courts, including the higher incidence of felonies in County Court 2, and the fact that the higher disposition rate in County Court 1 was more than accounted for by the higher rate of defaults and dismissals, Respondent's comparison of the statistics did not justify her claims about Judge Clem.

While Respondent's brochure may have been technically correct, her purpose was to create an impression that Judge Clem was causing needless delays and holding a large number of cases under advisement when there was contrary evidence before her and when she failed to properly analyze case load numbers to justify her contentions.

## III

■ The majority of the Masters concluded that the Commission proved by clear and convincing evidence that Respondent's disingenuous use of her brochure was a knowing misrepresentation of Judge Clem's record and that, by her conduct, Respondent violated Canon 5(A)(3)(d)(iii) and Canon 5(A)(3)(a) of the Code of Judicial Conduct.

Respondent's principal assertion in reply to these findings is that the brochure was basically true in a literal sense, and that she should not be sanctioned for making essentially true statements. Further, she argues the majority of the Masters failed to focus upon the brochure as a whole. In particular, she notes that the brochure's lead-off comment was

Indiana Code 33-10.5-8-1 requires county courts to schedule evening ses-

sions once each week. This has *not* been the practice in Madison County Court 2.[5]

Respondent asserts that the brochure was intended to suggest that more cases would be processed by the court if it operated at least one evening per week as required by state law.

Nevertheless, we are in accord with the specific conclusion of the majority of the Masters that campaign innuendo or equivocal statements designed to raise doubts about a judge destroy public confidence in the judicial office. By the selective use of anecdotal information and statistics, Respondent was trying to create the false impression that Judge Clem was causing needless delays and holding large numbers of cases under advisement, despite her knowledge to the contrary.

We agree with the conclusion reached by the majority of the Masters and find that Respondent made knowing[6] misrepresentations about the incumbent judge's judicial record during the course of her candidacy for office in violation of Canon 5(A)(3)(d)(iii) of the Code of Judicial Conduct. We also agree with the majority of the Masters that such conduct violated Canon 5(A)(3)(a), which provides generally that a candidate for judicial office shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary.

**IV**

The majority of Masters recommended that Respondent be privately reprimanded for her conduct. The Commission recommends that Respondent be publicly reprimanded.

Upon a finding of misconduct, the Court may impose a variety of sanctions. Adm. Disc. R. 25(IV)(A). We are not limited by a recommendation of the Masters as to the sanction to be imposed in any case. *Id.* 25(IV)(B). In this case, we agree with the Commission that a public reprimand is warranted.

We are mindful that Respondent mitigated the violations by destroying additional copies of the original brochures and redrafting the brochure as suggested by the Commission. However, a private reprimand takes place outside the world of published judicial decision-making. As such, it would not be a sufficient sanction where, as here, a candidate for judicial office has made knowing misrepresentations about another candidate.

The Respondent herein, Elizabeth Bashaw Bybee, is hereby publicly reprimanded for her violations of the Code of Judicial Conduct. Costs are assessed against the Respondent.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.

SELBY, J., concurs in Parts I, II and III but dissents from Part IV as to sanction.

---

5. Emphasis in original.

6. Under our Judicial Canons, "knowingly," "knowledge," "known," or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances. Code of Judicial Conduct, Terminology, *Indiana Rules of Court* 490 (West 1996).